*180 WEIMER, Justice.
11A jury convicted the defendant, Eric Dale Mickelson, of one count of first degree murder and sentenced him to death. In his direct appeal under La. Const, art. V, § 5(D), the defendant raises numerous assignments of error, including the failure of the district court to sustain his challenge for cause of a venire member and the lack of sufficient evidence to sustain the conviction. We find the assignment of error regarding sufficiency of the evidence to be without merit. However, constrained by statutory requirements, we are obligated to find reversible error in the district court’s failure to excuse a prospective juror for cause. Thus, we reverse and vacate the conviction and death sentence, pretermit discussion of the defendant’s remaining assignments of error, and remand for a new trial.
FACTS AND PROCEDURAL HISTORY
On July 11, 2007, eighty-six-year-old Charles Martin was strangled to death in his home in Shreveport, Louisiana. The victim was reported missing that day by his daughter, who summoned the police to the victim’s home after repeated attempts to contact him proved unsuccessful. In speaking with police, the victim’s daughter ^identified Beverly Susanne Arthur (Arthur) as someone who had been spending time with the victim and who had stolen prescriptions from him in the past. She reported that a rug and a small wooden barrel full of rare and foreign coins were missing from the victim’s home and that an inspection of the victim’s bank statement revealed checks that did not appear to have been signed by him.
The Shreveport Police Department began the investigation of the victim’s disappearance by examining the suspicious bank transactions and discovered that Arthur had attempted to cash a check from the victim’s account. After obtaining Arthur’s address and a surveillance video of Arthur from the bank, a corporal was informed by bank personnel that another individual, identified as Michael Jones, had also attempted to cash a check from the victim’s account.
Armed with this information, the corporal and his partner elected to conduct drive-by surveillance of Arthur’s home on Torento Lane in Shreveport. As they were passing the'house, they observed the victim’s car in the driveway and a white male, later identified as the defendant, standing in the yard. The corporal exited the car from the passenger position and *181 approached the individual he believed at the time to be Michael Jones, calling out “Michael.” The defendant looked back over his shoulder nervously and reached for his abdominal area. Suspecting the defendant might be reaching for a weapon, the corporal drew his weapon, ordered the defendant to the ground, and handcuffed him. In the meantime, the other officer proceeded to the front door of the house, from which two people, later identified as Arthur and her mother, were exiting.
Once the defendant was secured, it was determined that he was not Michael Jones. The defendant provided the officers with his name, and he was then informed that the officers were there because the ear parked in the driveway belonged to the | -¡victim. The defendant explained that he and Arthur had dropped the victim off at a bus stop downtown. After summoning backup, the keys to the victim’s car were obtained from Arthur. A search of the vehicle revealed nothing of note. However, after frisking the defendant a second time, the victim’s identification and a key to the victim’s car were found in the defendant’s possession. With that discovery, the defendant and Arthur were transported to the police station in separate vehicles.
Before departing the scene, consent was obtained from Arthur’s mother to search the premises. The coins missing from the victim’s home and one of the victim’s checks with the signature portion torn off were discovered in Arthur’s bedroom.
In his interview at the police station, the defendant initially denied any knowledge of the victim’s whereabouts, insisting that he and Arthur had dropped the victim off at a bus stop in downtown Shreveport and had not seen him since. However, after further questioning from detectives, the defendant admitted that he had helped Arthur break into the victim’s house. He explained that he had opened a window in the back of the house to allow Arthur to climb in. She then let the defendant in through the front door. Once inside, Arthur knocked on the bedroom door trying to wake the victim. When the victim, who was hearing impaired, did not awaken, the defendant kicked in the bedroom door. It was then that the victim saw the defendant and, according to the defendant, the victim “wasn’t real happy.” The defendant stated that he grabbed the victim by the neck and strangled him until he stopped moving. He then placed the victim’s body in the bathroom while Arthur moved about the house collecting items. The defendant and Arthur eventually dressed the victim, placed his body in the back seat of his car, and drove the car to purchase drugs.
14As the interview continued, the defendant provided more details about the victim’s murder. Pursuant to the defendant’s directions, detectives were able to recover the victim’s body, which had been dismembered.
On September 5, 2007, a Caddo Parish grand jury returned an indictment charging the defendant with first degree murder, in violation of La. R.S. 14:30. Following the appointment of counsel, on September 7, 2007, the defendant entered a plea of not guilty.
Jury selection began on July 25, 2011. A panel of twelve jurors and two alternates was chosen, and trial commenced on July 30, 2011. The state concluded the presentation of its case on August 2, 2011. The defense rested its case the following day after calling a single witness, a forensic pathologist. Following deliberations later that day, the jury returned the unanimous verdict of guilty on the count of first degree murder.
The penalty phase commenced on August 4, 2011. The next day, the jury *182 unanimously returned a verdict of death, Ending the following aggravating circumstances: (1) the defendant was engaged in the perpetration or attempted perpetration of an aggravated burglary and a simple robbery; and (2) the victim was sixty-five years of age or older. See La.C.Cr.P. art. 905.4(A)(1) and (10). The district court formally sentenced the defendant to death for the first degree murder of Charles Martin. This direct appeal, in which the defendant asserts a total of twenty-nine assignments of error, ensued.
| .LAW AND ANALYSIS

Sufficiency of the Evidence

Although we ultimately conclude on other grounds that the defendant’s conviction and sentence must be reversed and the case remanded for a new trial, we begin our analysis by addressing the sufficiency of the evidence assignment of error because the lack of sufficient evidence to sustain the conviction would entitle the defendant to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981). See State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 531.
The defendant was indicted for first degree murder pursuant to La. R.S. 14:30. The relevant portion of this statute defines first degree murder as follows:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, assault by drive-by shooting, first degree robbery, second degree robbery, simply robbery, terrorism, cruelty to juveniles, or second degree cruelty to juveniles.
[[Image here]]
(5) When the offender has specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or sixty-five years of age or older.
To affirm a conviction, an appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational finder of fact to conclude that every element of the crime was proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Martin, 93-0285, p. 5 (La.10/17/94), 645 So.2d 190, 194; State v. Captville, 448 So.2d 676, 678 (La.1984).
|6In this case, the defendant contends that the state failed to present sufficient evidence to prove every element of the crime beyond a reasonable doubt. Specifically, he contends the state failed to present sufficient evidence that he had the “specific intent to kill or inflict great bodily harm upon [the] victim.” In particular, he alleges that there was pervasive evidence of his intoxication at the time of the offense, evidence sufficient to support his contention that he was so intoxicated he could not form the requisite specific intent to commit the crime, and that the state failed to present any evidence to negate this fact.
Specific criminal intent is defined as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances and the defendant’s ac *183 tions. State v. Broaden, 99-2124, p. 18 (La.2/21/01), 780 So.2d 349, 362; State v. Graham, 420 So.2d 1126, 1127 (La.1982). Specific intent may be formed in an instant. State v. Cousan, 94-2503, p. 13 (La.11/25/96), 684 So.2d 382, 390.
Voluntary intoxication will not excuse a crime, but it is a defense to a specific intent offense if the circumstances demonstrate that intoxication precluded formation of the requisite intent. See La. R.S. 14:15(2);[1] State v. Legrand, 02-1462, p. 7 (La. 12/3/03), 864 So.2d 89, 95-96. The defendant has the burden of proving his intoxication defense; thereafter, it falls to the state to negate that defense by showing beyond a reasonable doubt that specific intent was present despite the defendant’s alleged intoxication. See State v. Smith, 94-2588, p. 5 (La.App. 4 Cir. 3/27/96), 672 So.2d 1034, 1038, citing State v. Davis, 92-1623, p. 10 (La.5/23/94), 637 So.2d 1012, 1020. Whether voluntary intoxication in a particular case is sufficient to preclude specific intent is a question to be resolved by the trier of fact. See Davis, 92-1623 at 10, 637 So.2d at 1020.
In the instant case, there is no dispute that the defendant and Arthur ingested crack cocaine around the time of the crime. In his confession, the defendant repeatedly referenced the fact that he was “high” when he and Arthur went to the victim’s home. In fact, the district court acknowledged that “[t]here’s intoxication evidence all throughout the confession and there is evidence of cocaine use and abuse throughout the case with respect to [the defendant] and his eodefen-dant.” However, the question of whether that intoxication precluded the defendant from forming specific intent was a question to be resolved by the jury. See Davis, 92-1623 at 10, 637 So.2d at 1020.
In his statement to police, the defendant, while touting his cocaine use, never suggested that he did not know what he was doing when he went to the victim’s house with Arthur. He explained that he opened a window to enable Arthur to enter the house and then waited for her to let him in through the front door. He told police that he kicked in the bedroom door so Arthur could talk to the victim, that the victim “wasn’t real happy” to see the defendant, but that the victim “didn’t have a very long time to look at [him]” because he quickly “rung [the victim’s] neck.” The defendant explained that he grabbed the victim by the neck and “just kind of locked up like a|8pit bull would lock up,” until the victim quit moving. He then stated that he put the victim’s body in the bathroom while Arthur removed items from the house.
Standing alone, the defendant’s detailed description of the murder and the fact that he admitted choking the victim until he was sure he was dead could permit a reasonable trier of fact to conclude that the defendant had the specific intent to kill or inflict great bodily harm upon the victim, even while accepting the fact that he was high on cocaine at the time. This is especially true given the absence of even a self-serving statement from the defendant claiming he was too intoxicated to know *184 what he was doing.[2]
While this evidence provides a reasonable basis for a jury to find proof of specific intent, it is not the only evidence of the defendant’s motivation and state of mind at the time of the killing. The defendant explained to police:
There was nothing I wanted. Did it all for [Arthur] because she wanted to. She wanted it. That’s what she wanted to do. I dropped her off at the end of the street and she walked all the way down there and tried to get in that house and do that to [the victim] herself. But she couldn’t do it. She didn’t have the strength to do it. So she came all the way back up that ... street to get me to go down there and let her in that ... house. And when she got me manipulated to do that, of course, we wént on a dope run first. By the time she got me manipulated to do that and got me in that ... house, she got me manipulated to bust the bedroom door open and manipulated enough to ring his ... neck for her. And I did. I did. She didn’t.
In addition to the defendant’s statement, the state elicited testimony from a forensic pathologist that when a victim is being strangled, he will lose consciousness in ten to twelve seconds, but that it will take up to fifty more seconds of strangulation |9before he dies. The scientific evidence, thus, establishes that defendant strangled the victim for a significant amount of time after he no longer posed a threat of any kind.
The defendant admitted that he strangled the victim until he knew the victim was dead, an admission supported by the autopsy results, and he admitted that he did so, not because he was high on cocaine, but because Arthur asked him to. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have determined that the defendant had the specific intent to kill or inflict great bodily harm. This assignment of error lacks merit.

Challenge for Cause

The defendant contends the district court erred in denying his challenge for cause of prospective juror Roy Johnson. He argues that the this error required him to exercise one of his peremptory challenges to excuse Roy Johnson, thereby depriving him of the constitutional right to his statutory allotment of peremptory challenges.
Louisiana Const, art. I, § 17(A) guarantees to a defendant the “right to full voir dire examination of prospective jurors and to challenge jurors peremptorily.” The number of peremptory challenges granted to a defendant in a capital case is fixed by law at twelve. La.C.Cr.P. art. 799. While the number and the manner of exercising peremptory challenges is-provided through legislation, La.C.Cr.P. arts. 795, 799, and 799.1, the peremptory challenge is not merely a statutory right. This court has long recognized that when a defendant is forced to utilize a peremptory challenge to correct an error in denying a challenge for cause and thereafter exercises all available peremptory challenges on other prospec *185 tive jurors, a substantial right of the defendant, guaranteed by the Louisiana constitution, is affected. See State v. Monroe, 366 So.2d 1345, 1347 (La.1978). In such instances, prejudice is presumed |inand automatic reversal of the conviction results. See also Id.; State v. Campbell, 06-0286, p. 70 (La.5/21/08), 983 So.2d 810, 856, citing State v. Robertson, 92-2660, p. 3 (La.1/14/94), 630 So.2d 1278, 1280, and State v. Ross, 623 So.2d 643, 644 (La.1993).
The rationale behind Louisiana’s automatic reversal rule was summarized in State v. Jacobs, 99-1659, p. 4 (La.6/29/01), 789 So.2d 1280,1283-84:
In State v. Robertson, 92-2660, pp. 2-3 (La.1/14/94), 630 So.2d 1278, 1280-81, we discussed the evolution of Louisiana’s well-settled jurisprudential rule that prejudice is presumed when a defendant’s challenge for cause is erroneously denied and the defendant exhausts all of his peremptory challenges. In that ease, we noted that the Louisiana Code of Criminal Procedure (Acts 1966, No. 310) became effective January 1, 1967, and that Article 800 of the Code was intended, as the Official Revision Comment notes, to change the law by legislatively overruling[3]this court’s earlier decision in State v. Breedlove, 199 La. 965, 7 So.2d 221 (1942). Robertson, 630 So.2d at 1280.
In Breedlove, this court had held that there were three requirements for a denial of a defendant’s challenge for cause to constitute reversible error: (1) an erroneous ruling by the trial judge refusing to sustain the defendant’s challenge; (2) exhaustion of all of the defendant’s peremptory challenges; and (3) the defendant was forced to accept an obnoxious juror, either the one that should have been excused for cause, or, if the juror was peremptorily challenged, a subsequent juror that defendant would have peremptorily challenged but for the fact that he had already exhausted his peremptory, challenges. Breedlove, 7 So.2d at 226-227. In enacting Article 800, the legislature overruled Breedlove with regard to the third “obnoxious juror” requirement. See Robertson, 630 So.2d at 1280. Thereafter, a defendant need only show two things to constitute reversible error: (1) that the trial judge erred in refusing to sustain a challenge for cause by the defendant; and (2) that the defendant exhausted all of his peremptory challenges. Id. at 1281.
The reasoning for eliminating the “obnoxious juror” rule is that Louisiana, unlike many other states, constitutionally provides that the accused has a right to challenge jurors peremptorily, with the number of challenges being fixed by law.
[nTIius, under the legislatively enacted code as it currently exists, this court is constrained to hold that a defendant need make only two showings to establish error warranting reversal of a conviction and sentence: (1) the district court erred in refusing to sustain a challenge for cause; and (2) the defendant exhausted all of his peremptory challenges.[4] See La. C.Cr.P. art. 800.
*186 In this case, the defendant exhausted all of his peremptory challenges. Accordingly, the sole issue presented for our resolution is whether the district court erred in denying the defendant’s challenge for cause of Roy Johnson.
The defendant’s challenge for cause in this case was based on Roy Johnson’s refusal to consider relevant statutory mitigating circumstances at the penalty phase of the defendant’s capital trial in the event he was convicted of first degree murder. In Louisiana there are two requirements necessary to challenge a juror for cause: (1) that “the juror is not impartial, whatever the cause of his partiality;”[5] and (2) that “the juror will not accept the law as given to him by the court.” La. C.Cr.P. art. 797(2) and (4).
A juror in a capital case must be willing to consider the imposition of both a death sentence and a life sentence, based on all of the evidence and on the instructions given by the trial judge. State v. Miller, 99-0192, p. 8 (La.9/6/00), 776 So.2d 396, 402. At the conclusion of the presentation of evidence during the penalty phase of a capital trial, “a juror must find beyond a reasonable doubt the existence of at least one statutory aggravating circumstance, and then must consider any mitigating circumstances (statutory or otherwise) before determining whether or not the death sentence should be imposed.” Id,., citing La.C.Cr.P. art. 905.3 and Blystone v. Pennsylvania, 494 U.S. 299, 307, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). “While a juror has the discretion to assign whatever weight the juror deems appropriate to any aggravating and mitigating circumstance established by the evidence, the juror must be willing to consider mitigating evidence relevant to the character and propensities of the defendant (which is the focus of a capital sentencing hearing) and must be willing to fairly consider a life sentence.” Miller, 99-0192 at 8-9, 776 So.2d at 402-03.
In Miller, we acknowledged the extreme difficulty faced by district courts in ruling on challenges for cause to a prospective juror, especially when the court is asked to determine whether it has been demonstrated, in a reverse-Witherspoon[6] challenge, that a prospective juror’s bias in favor of the death penalty would substantially impair his or her ability to follow the law as instructed. Miller, 99-0192 at 14, 776 So.2d at 405. Recognizing that the line-drawing required of district courts faced with challenges for cause of prospective jurors who give equivocal or contradictory responses during voir dire is complicated and oftentimes daunting, we reiterated the well-settled principle that an appellate court should accord great deference to the district court’s ruling on a challenge for cause, which is necessarily based, in part, on the court’s *187 personal observations during questioning. Id., 99-0192 at 14, 766 So.2d at 405-06. As we recognized in Miller, a district court is vested with |1sbroad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. Id.; State v. Cross, 93-1189, pp. 6-7 (La.6/30/95), 658 So.2d 683, 686-87; Robertson, 92-2660 at 4, 630 So.2d at 1281.
However, while remaining cognizant of the broad discretion afforded a district court when ruling on challenges for cause, this court has cautioned that a prospective juror’s responses during voir dire cannot be considered in isolation and that a challenge for cause should be granted, even when a prospective juror declares his or her ability to remain impartial, if the juror’s responses, as a whole, reveal facts from which bias, prejudice, or inability to render a judgment according to law may be reasonably inferred. State v. Frost, 97-1771, p. 4 (La.12/1/98), 727 So.2d 417, 423; State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990); State v. Brown, 496 So.2d 261, 264-65 (La.1986); State v. Jones, 474 So.2d 919, 929 (La.1985). Nevertheless, a refusal to disqualify a prospective juror on grounds he or she is biased will not constitute reversible error or an abuse of discretion if, after further inquiry or instruction (frequently called “rehabilitation”), the prospective juror demonstrates a willingness and ability to decide the case according to the law and the evidence. Jacobs, 99-1659 at 6, 789 So.2d at 1285; Robertson, 92-2660 at 4, 630 So.2d at 1281. As explained in State v. Lee, 559 So.2d 1310, 1318 (La.1990):
When a juror expresses a predisposition as to the outcome of a trial, a challenge for cause should be granted. Yet, if after subsequent questioning the juror exhibits the ability to disregard previous views and make a decision based on the evidence presented at trial, the challenge is properly denied. When assessing whether a challenge for cause should be granted, the trial judge must look at the juror’s responses during her entire testimony, not just “correct”, isolated answers; or, for that matter, “incorrect”, isolated answers. [Citations omitted.]
|14In this case, the district court conducted voir dire in a bifurcated manner, initially calling prospective jurors in groups of thirteen to fourteen. With the exception of a single question posed by the district court, the questioning during voir dire was left to the attorneys for the state and the defendant. At the conclusion of the questioning for each group, the attorneys were called on to articulate their challenges for cause. After considering the arguments, the district court ruled on the challenge or, if the court felt clarification or rehabilitation was necessary, called the prospective jurors back for further questioning before ruling.
Roy Johnson was on the first panel of prospective jurors. On that panel were two other individuals with the same surname, both women: Deloris Johnson and Lekeeta Johnson.[7] Questioning was initiated by the state, with the prospective jurors being asked to indicate their attitudes toward the death penalty using a scale of one to five, with one indicating the individual would consider death as the only appropriate verdict for murder and five *188 indicating the individual would never vote to impose the death penalty. Roy Johnson was the second prospective juror to be asked his feelings about the death penalty. He responded: “I ain’t have no problem with it.... Not for the death penalty if everything pointed to it, the evidence pointed to it, to what the particular person did.” When the prosecutor probed further, explaining that he was not asking about the guilt phase of the trial, but the penalty phase, Roy Johnson remarked: “I feel if he is already found guilty it all depends on how the court is, you know, I mean, listening to all the evidence and everything, and he probably is guilty, but you can say guilty in one stage and say it depends. It’s certain things |1Bcause him to do it. So I couldn’t say the death penalty there.... I’m open to both ways, you know.” According to Roy Johnson, who rated himself a three on the prosecutor’s scale, “I have no problem with the death penalty one way or the other.” To clarify, the prosecutor asked:
[State:] ... And, Mr. Johnson, is there anything else? Just before I get off of you I just want to make sure that both of these are open and there is not anything swaying you one way or the other. Is that right?
[Johnson:] No.
[State:] Until you hear the evidence, right?
[Johnson:] Until I hear the evidence.
On that note, the prosecutor turned his questions to the other prospective jurors in the group. The next time Roy Johnson was questioned, it was the defense’s turn to probe his attitudes toward capital punishment.
[Defense:] What do you think about the death penalty?
[Johnson:] I think it’s a good thing that’s legal. If the person did it, you should have no doubts that the person did it.
Defense counsel then posed a hypothetical — a defendant who has no defense to his crime (e.g., intoxication, insanity, retardation, self-defense, accident) is found guilty of first degree murder — and asked Roy Johnson what his verdict would be in that instance. Roy Johnson replied: “Then it is the death penalty ... If that’s what happened, if that’s what you are saying exactly happened, that’s it.” When questioned as to whether that verdict would be automatic, Roy Johnson replied: “No, it’s not automatic. If that’s what you are saying that’s the way it was, if that’s the way it was. I mean you didn’t bring up more evidence.... If there is no doubt in my mind after all the evidence and everything laid on the table, nobody else bring[s] nothing [ 1(ielse to change my mind, yes, I will give him the death penalty.”[8] The following exchange occurred:
[Defense:] ... Is there something that we could put on then [in the penalty phase] in terms of mitigating evidence that you would listen to?
[Johnson:] That would be up to you then. I’m listening.
*189 [[Image here]]
[Defense:] All right. Do 1 have kind of an uphill battle then?
[Johnson:] No. Just do your job. That’s it.
[Defense:] Well, before you were saying, you know, if he had the specific intent to kill then the death penalty.
[Johnson:] The death penalty, I still mean that, but now you are talking about you bringing something else to the table. Let’s find out what it is. I mean I ain’t going to just kill a man just because. If somebody made a mistake this time and now they got new evidence on him and everything, I’m willing to listen.
[Defense:] All right. Could you listen to the mitigating circumstances that the law puts out there?
[Johnson:] Yeah, I can listen.
[Defense:] For example, the guy had some mental illness or because he was drinking or doing drugs so that he couldn’t decide to conform to the law.
[Johnson:] No, if it was something that he was born with, some kind of handicap or whatever, that’s a different story. Drug, alcohol, whatever, that’s no excuse for that. [Emphasis added.]
117[Pefense:] All right. Do you understand that the law in ... setting out of mitigating circumstances includes the use of alcohol and drugs so that a person cannot conform his conduct to the laws?
[Johnson:] You assume that yourself. I don’t see how, no reason why ... he shouldn’t get the death penalty. [Emphasis added.]
[Defense:] Is what you are saying then that that’s not going to be a mitigating circumstance for you?
[Johnson:] No, that’s not. [Emphasis added.]
[Defense:] Nothing I could say about that?
[Johnson:] No, because if he did drugs or alcohol and went out and he had killed somebody, he did it on his own, and as far as to kill somebody that he didn’t even know or nothing, yeah, I would give him the death penalty. He will come around and do the same thing to me the next time he get drunk if I be in his way. [Emphasis added.]
Defense counsel then explained to Roy Johnson that the decision to impose a death sentence must be based on the prospective juror’s individual judgment about what is right, but that the verdict has to be unanimous. Afterwards, the following exchange ensued:
[Defense:] Is what you are telling me you are the kind of guy who is going to stick to his guns?
[Johnson:] No, no, no, no, no, I’m not the kind of guy that’s going to stick to his guns. After you bring something up to the table that show me that, hey, we got some new evidence, let’s look at this here, I’m not — I’m not— I’m not hard ball, no.
Then, after once more explaining to Roy Johnson the different considerations at play in the guilt and penalty phases of a capital trial, defense counsel stated:
[Defense:] The bottom line is you always got a choice. Even if you find five aggravating circumstances, you can still vote for life. Does that bother you at all?
[Johnson:] No, it doesn’t bother me.
| ^[Defense:] Does it make you feel better?
[Johnson:] No. I’m going to do the right thing in my mind, period. I *190 mean you talking about the death penalty, yes, I would give the guy the death penalty if he was on drugs and alcohol and go out and kill somebody. Yes, I would do that. [Emphasis added.]
Apart from being asked whether he could respect other people’s opinions that might differ from his own, Roy Johnson was asked no further questions.
At the close of defense counsel’s questioning, the attorneys were asked to lodge their challenges for cause. Defense counsel challenged Roy Johnson because he would not consider intoxication as a mitigating factor.[9] Although the district court elected to bring back two potential jurors for further questioning, or rehabilitation, before ruling on the challenges for cause lodged against them, neither the state nor the district court suggested a similar course for Roy Johnson. Instead, the district court denied the defense’s challenge for cause, finding “no basis in my view for a cause challenge on Mr. Johnson, none.” Reminding counsel that it is “inappropriate to take one isolated out-of-context statement of one prospective juror and micro-dissect it to the point of reaching an absurd result,” the district court opined: “[L]ooking at Mr. Johnson and watching how he says, what he says and his manner and demeanor and looking at the totality of his testimony this afternoon I am convinced he would be extremely capable of being fair and impartial and neutral and would give [the defendant] a fair trial.”
JjjThe district court’s denial of the defense’s challenge for cause of Roy Johnson is premised on two findings: (1) it is inappropriate to take one isolated, out-of-context statement and micro-dissect it to the point of reaching an absurd result (indicating the court found only a single objectionable statement by Roy Johnson); and (2) Roy Johnson’s demeanor — how he says, what he says — and the totality of his testimony indicate “he would be extremely capable of being fair and impartial and neutral.” These findings, while reasoned and thoughtful, are, in the final analysis, simply not supported by the record when viewed as a whole.
A review of the voir dire reveals that Roy Johnson did not make just “one isolated out-of-context statement.” To the contrary, Roy Johnson stated unequivocally on the record not once, hut five times, that he would not consider evidence of intoxication as a mitigating factor in his determination of the appropriate sentence. Rather than retract from that statement, the last time he was questioned on the subject, he indicated that, not only would he not consider intoxication as a mitigating circumstance, he “would give the guy the death penalty if he was on drugs and alcohol and go out and kill somebody.” And he emphasized, ‘Yes, I would do that,” repeating his lack of equivocation: This final response to questioning indicates not just an unwillingness to consider intoxication as a mitigating factor in the sentencing determination, but a predisposition to vote for the death penalty if drugs or alcohol fueled the crime.
Moreover, while the district court does have the benefit of seeing the facial expressions and hearing the vocal intonations *191 of the members of the jury venire as they respond to questioning, giving the district court a distinct advantage in assessing the veracity and sincerity of the answers given, this unique perspective is primarily helpful in ferreting out unstated biases; not for downplaying stated predispositions. |2nIn this case, insofar as the mitigating circumstance of intoxication is concerned, the prospective juror’s responses never wavered. Facial expressions and vocal intonations notwithstanding, Roy Johnson was consistent in verbalizing an unwillingness to consider alcohol or drug induced intoxication as a mitigating circumstance in determining the appropriate sentence in this case. In fact, the “totality” of Roy Johnson’s testimony during voir dire, far from supporting the conclusions related to the propriety of Roy Johnson serving as a juror, establishes that this prospective juror would not only not consider intoxication as a mitigating factor, but he would regard it as a factor in aggravation.
When the state opened the voir dire and questioned Roy Johnson generally about his views on the death penalty, his responses were measured and even-handed. Considered in the abstract, as to a penalty, Roy Johnson was “open to both ways.” When the questioning became more specific, however, and the defense introduced the concept of mitigating evidence, and more particularly, the idea of alcohol or drug induced intoxication as a mitigating factor, Roy Johnson’s responses were decidedly less even-handed.
When asked by defense counsel, “Could you listen to the mitigating circumstances that the law puts out there,” Roy Johnson initially replied affirmatively. But when defense counsel probed further, explaining “[f]or example, the guy had some mental illness or because he was drinking or doing drugs so that he couldn’t decide to conform to the law,” Roy Johnson voluntarily and without prompting or being led qualified his prior response and segregated the type of mitigation evidence he could listen to: “No, if it was something that he was born with, some kind of handicap or whatever, that’s a different story. Drug, alcohol, whatever, that’s no excuse for that.” When defense counsel explained that the law requires a juror to 121listen to evidence of this mitigating circumstance, Roy Johnson replied: “You assume that yourself. I don’t see how, no reason why ... he shouldn’t get the death penalty.” In response to the logical, follow up question, “Is what you are saying then that that’s not going to be a mitigating circumstance for you,” Roy Johnson stated unequivocally: “No, that’s not.” When questioned further, and asked whether, in a room with twelve people, he would stick to his guns, Roy Johnson did appear- to ameliorate his stance, indicating that he would listen to new evidence. However, it appears that the new evidence he was referencing was evidence of a defense (ie., innocence) and that throughout the voir dire he remained confused as to the role of mitigating evidence. He stated: ‘Yeah, I think I do [understand the difference between the guilt and penalty phase] but if you got all the evidence and then you say the mitigating circumstances, if you looking at the mitigating circumstance[s] and you have all the evidence, I mean what’s the difference?” And yet, despite this confusion, when it was explained by defense counsel that “[t]he bottom line is you always got a choice,” Roy Johnson’s final words were: “I’m going to do the right thing in my mind, period. I mean you talking about the death penalty, yes, I would give the guy the death penalty if he was on drugs and alcohol and go out and kill somebody. Yes, I would do that.”
While Roy Johnson undeniably gave responses during voir dire that indi *192 cated, as a general proposition and in the abstract, that he would be willing to consider the specific facts and circumstances of the case and listen to all the evidence submitted before deciding the appropriate sentence, on the whole, his responses indicate that as to the mitigating circumstance of alcohol or drug induced intoxication, not only would he not consider alcohol or drug induced intoxication as a mitigating circumstance, but he was predisposed to vote for the death penalty if drugs or alcohol | ^influenced the crime. Indeed, his final statements clearly indicate a belief that death is the only appropriate penalty in such a circumstance.[10] The facts thus distinguish this case from those of State v. Lucky, 96-1687, pp. 3-4 (La.4/13/99), 755 So.2d 845, 848-49, wherein the challenged juror stated that he would consider mitigating evidence, but would require that evidence to be substantial before he would consider recommending a life sentence. While, as Lucky illustrates, a juror in a capital case has the discretion to assign whatever weight the juror deems appropriate to any aggravating and mitigating circumstances established by the evidence, the juror must be willing to consider mitigating evidence relevant to the character and propensities of the defendant (Id; Miller, 99-0192 at 8-9, 776 So.2d at 402-08), a task Roy Johnson’s answers indicate he would not perform.
The facts of this case are closer to those in State v. Maxie, 93-2158 at 5, 653 So.2d at 526. In Maxie, this court found that despite indicating “she could listen to the evidence, consider mitigating factors and impose a sentence of life imprisonment,” “[o]n the whole,” the prospective juror’s answers indicated that she was predisposed to vote for the death penalty because of the “rape-murder” elements l^of the case before her. Maxie, 93-2158 at 19, 23, 653 So.2d at 536, 537. More importantly, the prospective juror “agreed, in her response to the final question posed, that the death penalty should be imposed once the defendant’s guilt was established.” Id, 93-2158 at 23, 653 So.2d at 538. In Maxie, this final response, indicating an unwillingness to follow the law and to consider a life sentence under the facts of the case, without any attempt at rehabilitation, compelled the court’s conclusion that a challenge for cause should *193 have been granted by the trial judge. See Id.
Maxie is one in a long line of cases from this court which recognize that bias or impartiality on the part of a prospective juror can be removed by rehabilitation, but which find reversible error in denials of challenges for cause when, as in this case, there has been no attempt to rehabilitate a prospective juror whose unequivocal statements in voir dire evidence an inability to follow the law. See Jacobs, 99-1659 at 12, 789 So.2d at 1288 (trial judge was presented with challenges for cause to two jurors who had unequivocally stated on the record that they could only impose the death penalty, and instead of granting the challenges or attempting to rehabilitate the jurors through further questioning, simply denied the challenges. Noting that “[wjhile the jurors might possibly have been rehabilitated upon further questioning by the prosecutor, they were not,” this court found reversible error in the denial of the challenges.); Cross, 93-1189 at 8, 658 So.2d at 687 (“A trial judge’s refusal to excuse a prospective juror for cause is not an abuse of discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, where subsequently, on further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and evidence. However, where, as here, there has been no attempt to rehabilitate [the prospective juror] subsequent to his remarks expressing his opinion in this area, the challenge for cause should have | ^been granted.”) (citations omitted; emphasis in original); State v. Sugar, 408 So.2d 1329, 1331 (La.1982) (noting that prospective juror’s answers “preponderate in favor of the fact that she was not impartial,” and that “[t]he juror might possibly have been rehabilitated upon further questioning by the prosecutor or the trial judge. Unfortunately for the state, she was not. Reversible error occurred when the defense challenge for cause was denied.”). In such cases, the court has found the risk that the district court’s denial of the defendant’s challenges for cause might have “infected [defendant’s] capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized.” Morgan, 504 U.S. at 736,112 S.Ct. 2222 (internal quotations omitted).
In this case, while Roy Johnson might possibly have been rehabilitated upon further questioning by the state or the district court, he was not, despite the fact that his final response with respect to a murder committed while under the influence of drugs or alcohol was clearly prejudicial to the defendant, whose confession revealed that he was high on cocaine when he killed the victim. As this court observed in Robertson in reversing a defendant’s capital conviction and sentence on grounds that the district court erred in denying a challenge for cause to a juror who made clear he could not consider a life sentence in a case in which the defendant killed two or more persons:
[A] potential juror who indicates that he will not consider a life sentence and that he will automatically vote for the death penalty under the factual circumstances of the case before him is subject to a challenge for cause by the defendant. It is irrelevant that the potential juror can conceive of different factual situations where he might consider voting for a life sentence where his unwillingness to consider such a sentence in the case before him is clear.
Robertson, 630 So.2d at 1284.
12ftlu the instant case, the district court relied heavily on Roy Johnson’s “manner and demeanor” and the “totality of his testimony” to refute the defense’s argu *194 ment that Roy Johnson could not consider a life sentence under the factual circumstances of this case. Further, the district court dismissed Roy Johnson’s unequivocal rejection of intoxication as a mitigating circumstance as an “isolated[,] out-of-context statement,” but the record in this case belies this finding. Clearly, the district court’s decisions as to the capabilities of a prospective juror are entitled to deference, but, in light of Roy Johnson’s unequivocal responses during voir dire and the lack of rehabilitation, the district court’s reliance on this prospective juror’s demeanor to overcome his stated prejudice was an abuse of discretion.[11]
^CONCLUSION
Other than this error, the record in this case reveals a district court that was learned, diligent, and ever-vigilant in attempting to meet its constitutional obligation to ensure that a fair and impartial jury was empaneled. However, Roy Johnson displayed an inability to follow the dictates of La.C.Cr.P. art. 905.5, which mandates intoxication “shall be considered” as a mitigating circumstance. Roy Johnson stated several times that he could not consider alcohol or drug induced intoxication as a mitigating circumstance in deciding the appropriate sentence, with his final words indicating he would impose the death penalty if drugs or alcohol fueled the crime. When a prospective juror holding such an opinion is not excused for cause, and the defense exhausts its peremptory challenges, as occurred here, there is reversible error. See La.C.Cr.P. art. 800. The defendant’s conviction and sentence are reversed. The case is remanded to the district court for a new trial.
REVERSED; CONVICTION AND SENTENCE VACATED; REMANDED FOR NEW TRIAL.
GUIDRY, J., concurs and assigns reasons.
VICTORY, J., additionally concurs and assigns reasons.
*195 WEIMER, J., additionally concurs with reasons.
HUGHES, J., additionally concurs and assigns reasons.
CLARK, J., dissents.
JOHNSON, C.J., dissents and assigns reasons.
KNOLL, J., dissents in part for reasons assigned.

. La. R.S. 14:15 provides, in relevant part:
The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:
(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.

. The defendant’s actions immediately after the murder likewise support the conclusion that he was not too intoxicated to be able to form the specific intent to kill or inflict great bodily harm. The defendant told police that immediately after the murder, he helped Arthur clean the victim’s house and that he then dressed the victim and placed him in the back seat of the victim’s car. Further, after he left the victim’s house, the defendant was able to plan and execute the disposal of the victim’s body. He was able to conduct coherent conversations with Michael Jones and to clearly articulate his version of events to police interviewing him.

. Strictly speaking, the doctrine of separation of powers prohibits the legislature from "overruling” judicial decisions. However, the legislature does have the ability to change the law, and, in this instance, it made a conscious decision to do so.

. Where a defendant ultimately exhausts all of his peremptory challenges, he must have had to use one of his peremptory challenges cura-tively to remove the objectionable juror or waive the complaint on appeal. State v. Magee, 11-0574, p. 27 (La.9/28/12), 103 So.3d 285, 307, cert. denied, — U.S. —, 134 S.Ct. 56, 187 L.Ed.2d 49 (2013); Campbell, 06-0286 at 71, 983 So.2d at 856; State v. Blank, *186 04-0204, p. 25 (La.4/11/07), 955 So.2d 90, 113.

. Under the Sixth and Fourteenth Amendments of the U.S. Constitution, the defendant in a capital case is entitled to an impartial jury in both the guilt and penalty phase. See Morgan v. Illinois, 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). A prospective juror who would automatically vote for a life sentence is not impartial and, therefore, is properly excluded for cause (Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)), as is a juror who would automatically vote for the death penalty, as such a juror would fail to consider the evidence of aggravating and mitigating circumstances in good faith (for that prospective juror, the presence or absence of either aggravating or mitigating circumstances would be irrelevant) thereby violating the impartiality requirement. See Morgan, 504 U.S. at 729, 112 S.Ct. 2222.

. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

. We cannot discount the possibility that the presence of multiple persons with the same surname on the venire panel may have inadvertently contributed to the ruling in this case through the unintended and accidental attribution of one Johnson's responses to those of another. At oral argument before this court, the state made precisely such a mistake.

. This line of questioning by defense counsel is consistent with the questioning expressly sanctioned by the Supreme Court in Morgan, supra. The questioning, which is not tied to the specific facts of this case (an aggravated burglary and a robbery with a victim over sixty-five years of age, where evidence of intoxication was offered as a defense) is formulated simply for the purpose of ascertaining, as Morgan permits, whether the prospective juror would automatically vote for the death penalty in the event of a conviction. Morgan, 504 U.S. at 735-36, 112 S.Ct. 2222 (”[T]he belief that death should be imposed ipso facto upon conviction of a capital offense reflects directly on th[e] individual’s ability to follow the law.... A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception.”).

. La.C.Cr.P. art. 905.5 lists the circumstances that “shall be considered” in mitigation at a sentencing hearing in a capital case. It includes, as one of those circumstances, that “[a]t the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication.” La.C.Cr.P. art. 905.5(e). The mitigation defense of intoxication was a significant part of the defendant’s defense as outlined previously-

. We ascertain nothing improper in defense counsel's voir dire examination. Defense counsel did not pose a hypothetical based on the facts of the case which sought a commitment or pre-judgment about issues to be resolved in the case, such as was deemed to be improper in State v. Holmes, 06-2988 (La. 12/2/08), 5 So.3d 42. In fact, defense counsel was prohibited by the district court from asking case-specific questions during voir dire.
Just before the voir dire questioning turned to Roy Johnson, the state objected to a defense question which sought to ascertain a prospective juror’s opinion under a hypothetical tied to the facts of this case (the victim was a man in his eighties and after his death his body was dismembered). The district court sustained the state’s objection, ruling (out of the presence of the venire panel) that defense counsel’s line of questioning was improper. Roy Johnson was the next prospective juror examined after the state’s objection was sustained, and the state did not object to any of the questions posed to Roy Johnson. Given the objections lodged just minutes before, it must be presumed that neither the state nor the district court found defense counsel’s questions improper. It is not the province of this court to supply an objection neither the state nor the district court perceived to exist.
Moreover, we note that it was in response to a line of questioning that cannot in any manner be construed as calling for a pre-trial commitment as to issues to be resolved at trial ("Does it make you feel better?”) that Roy Johnson volunteered, in his final answer on voir dire, that he would automatically vote for the death penalty if the defendant "was on drugs and alcohol and go[es] out and kill[s] somebody.”

. It is illuminating to consider Roy Johnson's responses in light of the responses of another prospective juror, David Bothwell, who was dismissed for cause on several grounds, among them "not being able to consider mitigation.” The district court remarked that Mr. Bothwell’s responses to questions about mitigation evidence,
[C]ause[ ] me some concern with regard to his very strong viewpoint about drugs. Really the issue is can you weigh and consider these factors and do you have an open mind about them. He said it would be very difficult to consider mitigation, and I think he classifies himself as a 2. I think he is probably closer to a 1 and a half, maybe even a 1.
Mr. Bothwell volunteered in his voir dire responses that for him, the only mitigating circumstance,
[W]ould be something that would be mental illness, in terms of something like that.
You know, being drunk or drugged or being a follower versus a leader, you know, you made choices up to that point to lead you to that point whereas a mental condition the choices may be different. So to me that would be really about the only reason that the death penalty wouldn’t be applied.
When instructed that the law requires a juror to actually listen to mitigation evidence, Mr. Bothwell indicated: "Oh, I will hear it, you know, but like I said, to me a lot of it goes back to the decisions that you make prior to the action.” Later, when questioning was turned over to the defense, Mr. Bothwell testified that "it would be very difficult for me to consider” the mitigating circumstances of drugs, alcohol or being under the influence of another person. Mr. Bothwell's responses do not markedly vary from those of Roy Johnson, and while there were other factors (prior knowledge of case, and hardship) that led to Mr. Bothwell's dismissal for cause, his difficulty in considering mitigation evidence was one of the factors cited by the district court in excusing him from service.