CRAIN, J.
The defendant, Devon Terrell Livous, appeals his conviction for second degree murder and life sentence at hard labor without benefit of probation, parole, or suspension of sentence. We affirm.
FACTS
On July 25, 2012, at approximately 3:45 p.m., the defendant shot and killed his fiancee, Raolatu Alowonle, in front of her eight-year-old son, J.B.[1] At trial, J.B. testified the defendant broke into his mother's apartment and "ambushed" them when they returned home. He explained the defendant pointed one of the victim's guns at her and ordered her to retrieve a second. After the defendant was armed with the two guns he made the victim and J.B. sit on the couch as he ranted and threw things. The victim and J.B. managed to escape the apartment and ran down the street as the defendant shot at them. J.B. testified he witnessed the defendant shoot his mother from across the sidewalk. The defendant then drove away. The victim died of multiple gunshot wounds to her back.
After J.B. identified the defendant in a photo lineup, the defendant was arrested and admitted shooting the victim with her gun as she ran away from him. The defendant claimed, however, the victim pulled the gun and pointed it in his face before he took it from her.
SUFFICIENCY OF THE EVIDENCE
The defendant was convicted of second degree murder. On appeal, he concedes he shot the victim, but argues the trial court erred in accepting the jury's verdict when the facts clearly supported a conviction for the lesser offense of manslaughter.
A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV, La. Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, an appellate court must determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt based on the entirety of the evidence, both admissible and inadmissible, viewed in the light most favorable to the prosecution. See Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) ;
*1040 State v. Oliphant , 13-2973 (La. 2/21/14), 133 So.3d 1255, 1258 (per curiam ); see also La. Code Crim. Pro. art. 821B; State v. Mussall , 523 So.2d 1305, 1308-09 (La. 1988). When circumstantial evidence forms the basis of the conviction, the evidence, "assuming every fact to be proved that the evidence tends to prove ... must exclude every reasonable hypothesis of innocence." La. R.S. 15:438 ; Oliphant , 133 So.3d at 1258.
The due process standard does not require the reviewing court to determine whether it believes the witnesses or whether it believes the evidence establishes guilt beyond a reasonable doubt. State v. Mire , 14-2295 (La. 1/27/16), --- So. 3d ----, ---- (per curiam ) (2016 WL 314814). Rather, appellate review is limited to determining whether the facts established by the direct evidence and inferred from the circumstances established by that evidence are sufficient for any rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Gardner , 16-0192 (La. App. 1 Cir. 9/19/16), 204 So.3d 265, 267. The weight given evidence is not subject to appellate review; therefore, an appellate court will not reweigh evidence to overturn a factfinder's determination of guilt. State v. Kirsh , 17-0231 (La. App. 1 Cir. 11/1/17), 234 So. 3d 941, 946.
The crime of second degree murder, in pertinent part, is the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1A(1). Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be formed in an instant. State v. Mickelson , 12-2539 (La. 9/3/14), 149 So. 3d 178, 183. Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from circumstances surrounding the offense and the defendant's actions. Mickelson , 149 So. 3d at 182. For example, specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Reed , 14-1980 (La. 9/7/16), 200 So. 3d 291, 309, cert. denied , --- U.S. ----, 137 S.Ct. 787, 197 L.Ed.2d 258 (2017).
Manslaughter is, pertinently, a homicide that would be second degree murder but is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31A(1). "Sudden passion" and "heat of blood" are mitigating factors in the nature of a defense. If the defendant establishes those factors by a preponderance of the evidence, a verdict for murder is inappropriate. Reed , 200 So. 3d at 311 ; State v. Eby , 17-1456 (La. App. 1 Cir. 4/6/16), 248 So. 3d 420, 424-25. However, provocation will not reduce a homicide to manslaughter if the factfinder finds the offender's blood actually cooled, or an average person's blood would have cooled, at the time the offense was committed. See La. R.S. 14:31A(1). In other words, if a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act. State v. Leger , 05-0011 (La. 7/10/06), 936 So. 2d 108, 170-71, cert. denied , 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). Provocation and time for cooling off are determinations made by the factfinder using the standard of the average or ordinary person with ordinary self-control. Reed , 200 So. 3d at 311.
J.B. was thirteen years old at the time of trial and was eight years old when his mother met, started dating, and was killed by the defendant. J.B. testified the defendant kicked in the front door of the victim's apartment and waited inside for *1041 them. When they entered through the back door, the defendant "pushed [them] in" and locked the door while pointing the victim's gun at them. J.B. explained he walked upstairs with the victim as she retrieved her other gun and gave it to the defendant. Then they returned downstairs while the defendant held one gun in his hand and had the other tucked into his pants. At the defendant's direction, J.B. and the victim sat on the couch while the defendant stood, "arguing" with the victim and throwing things around. J.B. clarified it was "mostly a one-sided argument," which included the defendant saying things about J.B.'s biological father who died when J.B. was four years old. The victim and J.B. got up and the victim was able to unlock a door, but the defendant told them to sit and "started arguing at us some more." They got up again and were able to run out the front door into the street.
J.B. testified the defendant tried to shoot them as they ran in the direction of J.B.'s aunt's apartment located on the same street. He described seeing his mother talking to a man and attempting to get help, when the defendant shot her. After witnessing the shooting from across the sidewalk, J.B. saw the defendant walk to his car and drive away.
J.B. was questioned about his mother's relationship with the defendant. He denied seeing her push, hit, or pull a gun on the defendant. However, J.B. testified he pointed his mother's gun at the defendant on one occasion because the defendant was pulling her hair and choking her.
Apartment buildings and businesses are located on Ryder Drive where the victim was killed. Surveillance video from a business shows a woman and child running and a man running behind them. Rene Caballero, a UPS driver who frequented the area, testified he was loading packages when he heard approximately three gunshots. He saw a man holding a gun walking away from a lady who was on the ground. Caballero then heard a second round of approximately twelve gunshots and lowered himself in his truck for protection. He peered outside and saw a woman he recognized as one of the Alowonle sisters.
Sterling W. Gladden III heard gunshots from his office on Ryder Drive. He saw a man with a pistol chasing a lady and child towards his building. Gladden used his office phone to call 911. Gladden saw the shooter cross the street and disappear between two buildings. He then heard multiple gunshots and saw a car speed by his building and a lady wearing a pink dress holding a pistol.
Alexander Hutchinson was changing a flat tire when a woman ran down the street screaming for help. He heard her say, "[H]e's trying to kill me. He's going to shoot me." Asked if a man was chasing her, Hutchinson testified, "He actually ran her down, stood over her, and shot her." The shooter shot the victim four times, looked at Hutchinson and said, "I got you" before running back down the street and speeding toward Essen Lane in his burgundy Camaro. Hutchinson testified he "freaked out" and immediately ran to his residence, but returned to speak to police. Hutchinson denied seeing a woman in a pink dress fire any shots.
Robert Barger heard gunshots as he pulled into a parking lot on Ryder Drive to pick up his wife from work. A woman fell facedown approximately twenty to thirty feet from him. Barger then saw a man holding a gun run to the woman, say something to her, shoot her as he stood over her, then run away. Barger moved toward the woman but withdrew to his truck when he heard more gunshots. A boy ran to Barger, and Barger saw a woman wearing pink firing a gun "randomly" toward a red Camaro driving down the street. He brought the boy into his wife's office building *1042 while people, including the woman in pink, gathered around the victim's body. When asked if the man who shot the woman appeared "angry," Barger answered, "yes." When asked if the man appeared in a rage, Barger answered, "Angry, yes."
The defendant testified and admitted shooting the victim with her gun, which he claimed he took from her after she pointed it in his face. He indicated the victim was his fiancée and the two had a tumultuous relationship that included several altercations. The defendant testified the victim pulled a gun on him on her birthday, months before the offense. He explained the victim argued with her uncle and sister earlier that day and became upset with him for not "getting into it" with her uncle. The defendant began arguing with her and she reached under a pillow on the bed for her gun. According to the defendant, when he saw her hand on the gun he grabbed her wrist and choked her until she dropped the gun. The defendant also claimed the victim pushed him down a set of stairs on a separate occasion, causing him to seek emergency medical treatment. The defendant further testified J.B. pointed a gun at him two days before the offense. The defendant testified he and the victim were arguing outside and J.B. just "came out of nowhere with the gun," holding it in the air. The victim told J.B. to put the gun down then the defendant took the gun from J.B.
The defendant testified he left the victim's apartment two days before the offense to "get a peace of mind" and avoid further altercations. However, he woke at her apartment the morning of the offense. He and the victim left the apartment separately but had plans to meet later. The defendant claimed he spoke to the victim on the phone and told her he was on his way back to the apartment and denied the conversation was heated. The defendant stated he used his key, which the victim knew he had, to enter the victim's apartment. A few minutes later, the victim arrived home with J.B. and he helped the victim with the grocery bags she held.
According to the defendant, he reminded the victim he needed to pay his car note and went upstairs to retrieve some cash stored in the victim's bedroom, when the victim told him she spent approximately $600 of the money on hair extensions. The defendant said he was angry for her taking the money, slapped her, and walked away. When he went to retrieve the money that was left, the victim pulled her gun from under her pillow and pointed it at the defendant. When asked how he felt when the victim pointed the gun at him, he testified, "I was already mad so, I mean, from her taking the money and she, you know, you know, I felt at the time, you know, I don't know."
The defendant stated he tried to grab the victim's wrist to disarm her, explaining, "It wasn't my first time hitting her so, I mean, I don't know, she probably would've shot me. No telling what could have happened[.]" He explained:
[W]e got into it, like, she kicking and stuff like that, got my hand on her wrist and, you know, I pulled the gun. The gun flew back towards the kitchen and I tried to push her off of me and I walked to get the gun and she pulled the [front] door ... [then they] ran out. I was running to get the gun and I ran out the apartment. I shot like once in the air and they kept on running and, you know, I ran behind them.
Asked why he chased the victim, the defendant said he "was mad" and "wasn't thinking." The defendant acknowledged pulling the trigger and seeing the victim fall, but claimed he did not know she was shot, thinking instead she ran out of breath. He stated he went to his car and rather than driving away, he drove toward *1043 the victim to render assistance; however, the victim's sister began shooting at his car.
The defendant's younger sister, Courtney, testified she met the victim "a couple times" and at their first meeting felt the victim did not have "a good spirit." She stated her brother "wasn't the same" and acted scared "to do, move a certain way." She testified she went to the victim's apartment on two or three occasions, once after the defendant called and told her the victim and her son "had guns pulled out on him"; however, no guns were out when she got there. Another time she arrived to help the defendant retrieve his clothes, and the victim cursed at her and waved a gun at her through a window. On the day of the offense, the defendant contacted her, told her he may have shot the victim, and asked her to keep the handgun until he turned himself in to the police. She explained, "I sensed a scarce [sic ] in his voice. I sensed that he wasn't himself at the time. I just, he looked blacked out to me at that point." She stated the defendant did not tell her why he shot the victim, but believed "He basically was scared that it was either him or her."
The defendant's former girlfriend, Katrina Golden, testified she saw the defendant the morning of the offense and that afternoon was visiting the defendant's sister when the defendant called. She said the defendant's sister looked shocked and wrote on a piece of paper that the victim had been shot. She saw the defendant after the offense and described him as "nervous" and "shaking," "almost like he wanted to cry." She said the defendant told her the victim pulled a gun on him and he took it from her. Golden recalled the defendant telling her about other incidents with the victim, such as the victim pushing him down stairs and waking to the victim pointing a gun to his face.
The defendant's mother, Pam Jackson, testified over the course of the defendant's and victim's relationship, she saw things she did not like, describing the victim as "controlling" and "pushy." Jackson described a telephone call with the victim that took place when the victim and defendant were not getting along. According to Jackson, "she called me and then she said she wanted to tell [the defendant] not to come back to my house because I am going to protect me and mine." Jackson said she asked if the victim was stating the victim would harm the defendant and the victim said yes. Jackson indicated she then warned the defendant about the victim but he did not listen.
To resolve conflicting testimony relative to factual matters, the jury must make credibility determinations and weigh the evidence. Reed , 200 So. 3d at 312. The jury can accept or reject the testimony of any witness. Mire , --- So. 3d at ----. The Jackson standard of review does not permit a reviewing court to substitute its own appreciation of the evidence for the factfinder's, assess the credibility of witnesses, or reweigh evidence. See State v. McGhee , 15-2140 (La. 6/29/17), 223 So. 3d 1136, 1137 (per curiam ); State v. Calloway , 07-2306 (La. 1/21/09), 1 So. 3d 417, 422 (per curiam ). Thus, in the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the jury, is sufficient to support a factual conclusion. Reed , 200 So. 3d at 312. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict based on an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. Calloway , 1 So. 3d at 418.
When viewed in the light most favorable to the state, any rational trier of fact could *1044 have found the state proved beyond a reasonable doubt the defendant had the specific intent to kill and committed second degree murder and the defendant failed to prove the mitigating factors of sudden passion or heat of blood. The defendant admittedly chased the victim and her child out of the apartment and down the street and fired the gun. The defendant's conviction was not irrational and will not be disturbed. See State v. Ordodi , 06-0207 (La. 11/29/06), 946 So.2d 654, 662.
EXCESSIVE SENTENCE
The defendant next argues his statutorily-mandated life sentence is unconstitutionally excessive in light of the circumstances of this case, where he contends the victim frequently brandished a gun to exert force on or intimidate him.
Both the United States and Louisiana constitutions prohibit the imposition of excessive or cruel punishment. U.S. Const. amend. VIII ; La. Const. art. I, § 20. A sentence is unconstitutionally excessive if it is grossly disproportionate to the severity of the offense or constitutes nothing more than a needless infliction of pain and suffering. State v. Shaikh , 16-0750 (La. 10/18/17), 236 So.3d 1206, 1209 (per curiam ). A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks one's sense of justice. State v. Weaver , 01-0467 (La. 1/15/02), 805 So.2d 166, 174.
Louisiana Revised Statute 14:30.1B mandates that a person convicted of second degree murder be sentenced to life in prison at hard labor without benefit of parole, probation, or suspension of sentence. The legislature defines criminal conduct and provides the penalties to be imposed against persons engaged in such conduct, which reflect the degree to which the criminal conduct affronts society. Weaver , 805 So.2d at 174 ; State v. Dorthey , 623 So.2d 1276, 1280 (La. 1993) ; see also State v. Fobbs , 99-1024 (La. 9/24/99), 744 So.2d 1274 (per curiam ). Statutorily mandated sentences are presumed constitutional; however, the sentence may be found unconstitutionally excessive if the defendant rebuts the presumption of constitutionality by proving he is exceptional, meaning because of unusual circumstances he is a victim of the legislature's failure to assign sentences meaningfully tailored to the culpability of the offender, gravity of the offense, and circumstances of the case. See State v. Johnson , 97-1906 (La. 3/4/98), 709 So.2d 672, 676 ; Eby , 248 So.3d at 428.
The defendant conceded he shot and killed the victim in front of her young son as they ran from him. At the sentencing hearing, J.B. testified about his mother's character and the sadness and nightmares caused by witnessing her murder and no longer having her in his life. The victim's father also made an impact statement. In imposing the sentence, the trial court recalled the "chilling" surveillance footage and facts of the offense as described by several witnesses. The trial court indicated it considered the defendant's presentence investigation report that detailed the defendant's criminal history dating from 1999, as well as the defendant's family, employment, educational, and social history. After reviewing all of the relevant information, the trial court found the mandatory life sentence was appropriate.
The defendant has failed to clearly and convincingly show that because of unusual circumstances he was a victim of the legislature's failure to assign sentences that were meaningfully tailored to his culpability, the gravity of the offense, and the circumstances of the case. Thus, the mandatory life sentence is not excessive. This assignment of error lacks merit.
*1045 CONVICTION AND SENTENCE AFFIRMED.

The minor child is referred to herein by his initials. See La. R.S. 46:1844W.