# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 23-614

**STATE OF LOUISIANA**

**VERSUS**

**HAROLD ALVIN CAMPBELL**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 14144-19
HONORABLE ROBERT L. WYATT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## SHANNON J. GREMILLION
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, D. Kent Savoie, and Wilbur L. Stiles, Judges.

**CONVICTION AFFIRMED.**

**Edward K. Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Harold Alvin Campbell**

**Harold Alvin Campbell**
**David Wade Correctional Center**
**670 Bell Hill Road**
**Homer, LA 71040**
**(000) 000-0000**
**IN PROPER PERSON**

**Hon. Stephen C. Dwight**
**Fourteenth Judicial District Attorney**
**John Eric Turner**
**Assistant District Attorney**
**901 Lakeshore Drive, Suite 600**
**P. O. Box 3206**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**GREMILLION, Judge.**

Defendant, Harold Alvin Campbell, appeals his conviction for the second degree murder of his wife, Edwina Hendricks Campbell, in violation of La.R.S. 14:30.1. Defendant maintains that the evidence was insufficient to establish specific intent. In a *pro se* brief, Defendant asserts that the State did not prove *mens rea*. For the reasons that follow, we affirm Defendant's conviction.

### PROCEDURAL POSTURE AND FACTS ADDUCED AT TRIAL

Mrs. Campbell was shot and killed on May 1, 2019. At the time, Defendant lived on Gieffers Street in Lake Charles with Ms. Campbell and her two daughters, Marshelle and Markenzy Harmon.

Marshelle was fourteen years old when her mother was slain. The week before the slaying, the family had taken a vacation to Jacksonville, Florida. Prior to this trip, Marshelle testified, her mother considered divorcing Defendant. Marshelle described the marriage of Defendant and her mother as "toxic."

On the day of the murder, Defendant had gone out drinking, which angered Marshelle's mother. Mrs. Campbell left to look for Defendant at around 5:00 p.m. She returned a short time later but left a second time to locate Defendant. Marshelle testified that her mother looked for Defendant on Adams Street but returned angry because Defendant had work the next day, "and he wouldn't come home."

When Defendant did return home, the home surveillance camera recorded him driving into the driveway. Later, he is depicted walking onto the front porch, lighting a cigarette, locating his house key, inserting the key into the lock, and opening the door.

Marshelle testified that before he entered the house, Defendant played loud music from his truck, which was parked next to the master bedroom window—something Marshelle said Defendant did frequently. After Defendant entered the

house, Marshelle heard her mother and Defendant arguing in the kitchen. She heard her mother saying that she was "done with" Defendant and told him to leave.

Marshelle then heard one gunshot followed by several rapidly fired shots. She rushed to the master bedroom, assuming her mother had shot Defendant in self-defense; instead, she saw her mother laying on the bed and Defendant standing in front of her. Marshelle then rushed to her room and called 9-1-1.

A recording of Marshelle's 9-1-1 call was played to the jury. Marshelle told the operator that Defendant was drunk and had a gun and that he had left the house. She locked the door to prevent Defendant from re-entering the house. Officers arrived and got the girls to leave the house and go to a police unit outside.

Markenzy, who was twelve at the time of the murder, testified at Defendant's trial. Her account of the evening of the murder was consistent with Marshelle's. Markenzy saw her mother and Defendant enter the bedroom. She thought her mother had dropped something when she heard the first gunshot. When she heard the initial shot, Markenzy ran into her mother's bedroom, then panicked, and screamed. She fled the room and went outside. Defendant was on the front porch of the house. He had a gun in his back pocket.

Markenzy went back into her mother's room. She saw "a ton of blood everywhere."

Defendant, too, called 9-1-1. In fact, he placed two 9-1-1 calls that evening to report that his wife had been shot. He placed a third call directly to the Lake Charles Police Department asking whether officers had been dispatched to the home. The jury also heard three calls to 9-1-1 that Mrs. Campbell had placed in the eighteen months prior to the shooting.

Sergeant Tony Magee, Corporal Travis Toten, and now-former Officer Steven Fontenot were dispatched to the scene. Sergeant Magee encountered a black male

who complied with commands and was handcuffed. Sergeant Magee's bodycam footage was played for the jury. In that video, Defendant was asked what had happened, to which Defendant replied, "I just couldn't take it no more." Corporal Toten's bodycam video was also played for the jury and was consistent with Sergeant Magee's.

Sergeant Magee testified that he did not recall Defendant smelling of alcohol, nor did Defendant exhibit signs of significant impairment.

Officer Fontenot was dispatched to the scene. After his arrest, Defendant was placed in Mr. Fontenot's unit, which was equipped with a camera that records activity in the back seat. On video from Mr. Fontenot's bodycam, Defendant is heard saying, "I didn't mean that [expletive]." Mr. Fontenot advised Defendant not to talk, as he did not know whether Defendant had been advised of his Fifth Amendment rights. Defendant's speech was slightly slurred, and his breath smelled of alcohol. However, Mr. Fontenot testified that Defendant was compliant and steady on his feet. While en route to the police station, Mr. Fontenot advised Defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

Defendant talked to himself while in the unit. He stated, among other things, "I don't know how I did that," and "that [expletive] pushed me." "Lord forgive me, I wasted my [expletive] life, I'm gone." "I'm going up the river now." "[Expletive], prison from here on out, when I had it good. I should have just left and went moved [sic]to my [expletive] trailer. Damn, I don't know why I was that upset." He later said that it was because he was "drunk and [expletive] up."

Sergeant Brenda Treadway of the Lake Charles Police Department was the lead detective on the case. Corporal Toten told her that Defendant had probably been drinking. However, Sergeant Treadway reviewed Sergeant Magee's bodycam

3

footage that showed Defendant's arrest. Defendant was seen being ordered to walk backwards toward Sergeant Magee and Corporal Toten. Sergeant Treadway did not "see anything that led [her] to believe [Defendant's] impairment may have been too much."

Mrs. Theresa Henry, a pastor at Trinity Full Gospel Ministries in Lake Charles, Louisiana, testified that Mrs. Campbell was a member of the church and had called her many times about marital strife. According to Mrs. Henry, she would typically get a call from Mrs. Campbell in the middle of the night because Defendant would come home intoxicated, and Mrs. Campbell would be afraid of what Defendant might do. Mrs. Henry testified that she went to the Campbells' residence five or six times under these circumstances. Defendant would typically "be in his truck with the music real loud, hollering out different things to her, talking, you know, and just walking around just being him." Mrs. Henry testified that she prayed with Mrs. Campbell many times "[a]bout [Mrs. Campbell's] safety, her children's safety, and about [Defendant] changing his life."

On cross-examination, Mrs. Henry stated that she did not contact law enforcement regarding the Campbells until the authorities sought her out in February 2020. According to Mrs. Henry, she knew Defendant had a gun because he had told her his gun was in his truck. She testified Defendant had never outright threatened Mrs. Campbell with his gun.

Dr. Patrick Hayes, a board-certified psychiatrist with an addictions medicine subspecialty, was accepted as an expert in the field of forensic psychiatry over defense counsel's objection that the field of expertise should be limited to issues of specific intent and intoxication. Dr. Hayes testified that intoxicated individuals can still form specific intent. Dr. Hayes stated that if someone is doing the same things they normally do while intoxicated, they will be less impaired than if they were put

4

into a new situation or location. He also noted that someone who consistently drinks will be able to process and get rid of the alcohol faster than someone who rarely drinks.

Dr. Hayes testified that Defendant's 9-1-1 call indicated to him that Defendant "had a coherent understanding of his actions, what they had caused." Additionally, he noted in Defendant's interactions with law enforcement that he was "behaving in an appropriate coherent, logical, goal-directed manner[,] following their commands, having discourse with them, [and] speaking to the arresting officers." Dr. Hayes interpreted Defendant's statement to officers that he "couldn't take it no more" as an attempt to provide "a logical, plausible excuse for his actions."

The video taken in the back of the police cruiser indicated to Dr. Hayes that Defendant demonstrated "an understanding of the societal response of the judicial response [sic] to his actions." He also testified that Defendant's driving as he approached the house and backed into his driveway indicated no impairment, noting he knew "a lot of people that not [sic] intoxicated would have difficulty with that action." Reviewing the video of Defendant approaching his front door from the truck while smoking, unlocking the door, and entering the house, Dr. Hayes noted, "So back to the idea of physical manifestations of massive intoxication, we don't see that he's unstable. I don't see that he's incapable of holding the door up. I don't see that the door is knocking him down. I don't see that the door's making him stumble." Dr. Hayes summarized the video as follows:

> I don't see any physical evidence of that ataxia, the disequilibrium, the abnormal gait, the stumbling, the falling down as he went over some fairly complicated terrain. So he made it up those stairs. He made it to the door. The door was leaning on him. He made it into the building while carrying a burning cigarette while smoking it and occasionally going from one hand to mouth to the other hand back to mouth to free up those hands to do things. And then that very last scene, what you see is not only did he get the door shut but this isn't -- I don't see any evidence that he was so intoxicated that he just fell in

5

the house, that he left the door open, left it ajar. He actually pulled the door snug behind him.

At the police station, Defendant was able to exit the police unit without issue, despite having his hands manacled behind his back, climbed the stairs, and was not knocked over despite being hit by a closing exterior door. Dr. Hayes testified that "physically, we'd expect somebody that was fall-down drunk, somebody that was significantly inebriated not to be able to tolerate that measure of energy put on them." While discussing the crime scene photographs and coroner's reports, Dr. Hayes testified, "If one is 3 to 5 feet away from one's wife and shoots her in the head, neck, and face five times, it's my opinion that he understood those actions."

That is not to say Defendant was not intoxicated, in Dr. Hayes's opinion. He testified that Defendant showed definite signs of intoxication. As Defendant mounted the steps into the home, he was very deliberate and demonstrated a "slight wobble."

Defendant called his sister, Patricia Campbell, to testify. Patricia testified that she witnessed Mrs. Campbell attack Defendant on several occasions. She never witnessed Defendant exhibit violent behavior toward Mrs. Campbell. Defendant drank most days except when he was working. This was a pattern Defendant exhibited since he turned twenty-one.

Patricia testified that Defendant called her as he waited for law enforcement to arrive after the shooting. He told her his wife was dead and the police were on the way. He did not relate anything about Mrs. Campbell being belligerent. In conversations with them at the detention facility, Defendant repeatedly told other family members that the situation was not as it appeared.

Sergeant Chris Johnson of the Lake Charles Police Department was present at the jail when Defendant was brought in. Sergeant Johnson did not notice the smell

of alcohol on Defendant, nor did he notice Defendant behaving as though he was intoxicated.

Ms. Monica Harmon, the victim's mother, testified that she had not known Defendant prior to him beginning a relationship with Mrs. Campbell. Her mother characterized Mrs. Campbell as strong-willed and willing to speak her mind, although she was a "[s]weet person" who would "[d]o anything for anybody." Ms. Harmon testified that she told law enforcement that the relationship between Defendant and Mrs. Campbell was very volatile, and she thought Mrs. Campbell would end up killing Defendant.

Ms. Harmon acknowledged that Defendant drank daily and always to excess. Ms. Harmon testified they had a family get together on Easter Sunday before the shooting, noting it was a wonderful day for the family as a whole and for Defendant and Mrs. Campbell, even though Defendant was drunk. She also acknowledged the family took a trip to Florida shortly after Easter. According to Ms. Harmon, Mrs. Campbell and Defendant were still getting along great through the trip. She saw pictures Mrs. Campbell posted on Facebook from the trip. Ms. Harmon testified that she was unaware of any arguments between Mrs. Campbell and Defendant from Easter Sunday through the trip and up to Mrs. Campbell's death. The arguments between Defendant and Mrs. Campbell usually centered on Defendant's drinking and philandering.

Defendant testified on his own behalf. He admitted shooting his wife but claimed it was not intentional. According to Defendant, he woke up the day of the shooting and immediately went to a convenience store and bought beer and Jack Daniels before going to the house on Adams Street and beginning to drink. After consuming that alcohol, Defendant went back to the store and bought a pint of Hennesey and a few loose beers. After drinking more on Adams Street, Defendant

7

testified he met his cousin on Goss Boulevard, where he continued drinking. After buying cigarettes from the store, he followed his cousin to South Lake Charles, where he bought more cigarettes and some gin. He then went to a house somewhere near the intersection of Kirkman and Eighteenth Street. He and his cousin then walked to another store, where Defendant bought Bud Light and either Courvoisier or Crown Royal, which he immediately started drinking. Defendant then returned to Adams Street, drank a little more, then went home.

According to Defendant, he believed Mrs. Campbell was gone because her car was not parked in front of the house, so he parked there and called her several times to have her bring him food. He testified that she did not answer. He then went back to Adams Street, where his friend told him they had not seen Mrs. Campbell, so Defendant returned home. At that point, he went into the house to lay down. He took his handgun with him into the house because he was worried about the possibility of getting robbed when he returned to his truck to head to work.

Defendant denied arguing with Mrs. Campbell. According to Defendant, as he was crawling across the bed, he came face-to-face with a man, which scared him, so he jumped back and immediately began firing his handgun at the man in the bed. He described the event as follows:

> I was shocked because once I was face-to-face like this here, I seen big lips, big nose, and big eyes. It did not look nothing like my wife, and my wife didn't [sic] supposed to be home. And that's when I jumped back and just started squeezing the trigger like this here. And I just was doing that with my finger and just kept doing it and ran back. And then I was like this here, looking. And I still couldn't make out the face. I'm trying to see who is this man. And the cover was all the way up here.

Defendant then indicated the cover was pulled up to the man's chin, claiming again that "[i]t didn't look like my wife." This man was positioned against the

8

headboard. Defendant, mistaking his wife for an unknown man, believed he was shooting a threat to his family.

Defendant testified that Marshelle and Markenzy were wrong when they testified that he was arguing with Mrs. Campbell. Defendant also testified that his wife would not have been sitting in bed while he stood over her shooting her, claiming she would have met him at the door. Defendant claimed that:

> If she was upset, she wouldn't have went to sleep. She would've met me at the door, and she would have fussed at me all the way until I walked in the house and went got in the bed. And she would've been standing up, chewing me out, chewing me out. And that's when Marshelle would come in and kind of save me and be like, Mama, come on. 'Cause as for her sitting in a bed laying down like that -- no, would not do that. She'll be pacing back and forth in front of that -- in front of the long chest-of-drawers just letting me have it. So it's no kind of way we would have been fussing and then she went and laid down.

Defendant claimed that Mrs. Campbell was not lying across the bed, as was visible in body camera footage, when he left the room but that she was against the headboard with the covers pulled all the way up to her neck.

According to Defendant, Mrs. Campbell was verbally abusive and would often call him a "bitch" because he was soft and weak, because he preferred to talk things through. Defendant acknowledged a pool party incident Patricia described when Mrs. Campbell had struck him, although he claimed he tried to suppress any memory of it. He also relayed an incident where Mrs. Campbell was yelling at him, he was ignoring her, so she threw a set of keys and hit him between his eyes; he called 9-1-1, then canceled the call allegedly because she told him she would tell the police officers he had hit her.

Defendant introduced a 9-1-1 call made by Mrs. Campbell in which she requested a unit be sent to Gieffers Street to remove her daughter, Tayler, from the residence. During the call, Mrs. Campbell stated that she and her daughter previously had physical fights and she was trying to avoid the same happening again.

Mrs. Campbell then called back and asked that the officers be cancelled because her daughter had left. Defendant confirmed that Mrs. Campbell and her daughter Tayler had gotten into physical fights. According to Defendant, his comments in the back of Mr. Fontenot's unit about how he did not mean to kill the victim, that he let her get the best of him, and that the "bitch" pushed him were made because he was having flashbacks of all the times his wife abused him.

On cross-examination, Defendant testified that when he was crawling across the bed, he did not initially even realize there was someone in the bed, despite the television being on. When asked why he was climbing into bed fully clothed and wearing shoes, Defendant testified:

> Well, if I'm real -- if I'm real drunk, I'll get on that side and then I lay down. Once I lay down, then I'll start taking off my shoes and then I'll take off my shirt, plug my phone up, take my gun -- take the clip out of it and set it on the side nightstand after I lay down.

Defendant offered no explanation for why the bullets he fired into his wife went through her and into the bed when he claimed he was shooting from in front of her while she was up against the headboard. When asked why the photograph did not match Defendant's story, he stated "it might not match or whatever or -- but I know what I did at the moment, you know, and I didn't shoot downwards." Defendant reiterated that Markenzy and Marshelle were lying when they testified that they heard Defendant arguing with Mrs. Campbell. He also claimed the girls moved Mrs. Campbell's body to explain why she was not in the position Defendant claimed she was in when he shot her.

According to Defendant, Mrs. Campbell was always hard on him due to "Well, my drinking, one. And my drinking." Eventually, he acknowledged they would also argue over cheating. According to Defendant, the only reason he knew it was Mrs.

Campbell who he repeatedly shot in their bed was because Marshelle had told him it was her mother that he killed.

Defendant called Dr. Leonard Weiss, an expert in the field of addiction psychiatry. Dr. Weiss opined that Defendant suffered from a severe case of Alcohol Use Disorder.

Dr. Weiss testified that an individual is considered sober with a BAC of up to 0.05 milligrams of alcohol per unit of blood, a BAC of 0.45 is lethal, and in between there are varying stages of intoxication with varying effects. The type of confusion described in Defendant's testimony corresponds to "a moderately high blood level." He testified that such confusion typically occurs when an individual's BAC is between 0.18 and 0.3.

Dr. Weiss opined that individuals who are chronic drinkers are much better at covering up how intoxicated they actually are when they drink; the fact that Defendant did not appear drunk does not mean he was not highly intoxicated. Additionally, Dr. Weiss opined that the poor lighting in the room, coupled with a less than optimal ability to perceive his surroundings based on chronic drink, could lead Defendant to the otherwise irrational belief that the person in his bed could not be his wife.

According to Dr. Weiss, chronic drinkers often lose brain volume in their limbic system, which causes them to lack empathy. He also noted a "very well documented" causal relationship between delusions and hallucinations and alcohol. Dr. Weiss testified that Defendant backing his truck into the driveway was not a complex task but was a "no-brainer" easily attributable to simple routine. Just because an individual appears sober after a traumatic event does not mean the individual was sober before the event: "If I'm kind of on automatic, and I'm drinking and I'm doing bad things or whatever the case may be. And then all of a

11

sudden, I'm confronted with a life-threatening situation, I sober up very fast." According to Dr. Weiss, it seemed "rather obvious" that Defendant thought he was shooting someone other than his wife at the time he unloaded his firearm into her.

On cross-examination, Dr. Weiss gave his opinion that Defendant could not have formed specific intent because he thought he was shooting someone other than his wife; however, he acknowledged that Defendant seemed capable at various points of intending the consequences of his actions. Finally, he testified that he believed Defendant's testimony "that there was an intruder that he was shooting up against the headboard."

Defendant then called Tayler Harmon, the victim's eldest daughter. Tayler testified that on May 1, 2019, she was at her mother's house doing laundry. Her mother took her home at 9:30 p.m. She did not recall her mother being upset at that time. She testified her mother left on foot a couple of times that day. Tayler testified her mother brought her home, which was about a twelve-minute drive, and stayed at her house for a bit to pray before going home. She also did not recall hearing any conversation between Defendant and Mrs. Campbell that day.

Detective Treadway was the last witness to testify at Defendant's trial. She noted that Corporal Toten had turned his bodycam off at the scene without authorization because her arrival and interaction with him was not recorded. She reiterated that Corporal Toten told her that Defendant was intoxicated.

Defendant was indicted on one count of second degree murder on June 13, 2019. Trial began on July 12, 2021. A mistrial was declared, as there were an insufficient number of potential jurors present to impanel a jury after the parties' strikes were exercised.

Defendant's second trial began on September 28, 2022. The jury unanimously convicted Defendant of second degree murder on September 30, 2022. In this appeal,

Defendant asserts one assignment of error through counsel which he contends that the State failed to prove beyond a reasonable doubt that Defendant had specific intent to kill or cause great bodily harm. Defendant also filed a pro se brief which also contends that he was so drunk he thought his wife was an intruder when he shot her repeatedly at close range in their bed and that he was prevented from asserting the defense of his intoxication.

### DISCUSSION AND ANALYSIS

We will first address Defendant's pro se contention that he was prevented from asserting the defense of intoxication. In his brief, Defendant states:

> [I]n this case Campbell should have been allowed to present evidence [sic] to the jury that he was too intoxicated at the time of his arrest to form the requisite specific intent described in the case. Instead, the district court allowed the [S]tate to relinquish control of Mr. Campbell's liberty without Due Process of Law or Equal protection by specifically forbading [sic] him his right to "make intoxication… a defense" or from attempting to show "that he could not form an opinion."

Defendant's only defense in the case was that he was too intoxicated to form specific intent. The court funded Defendant's retainer of Dr. Weiss, the testimony of whom was solely directed at establishing that Defendant was too intoxicated to form specific intent. We find nothing in the record— nor has Defendant referred us to a single instance— in which his defense of intoxication was limited by the trial court. This assignment of error lacks merit.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371, provides the proper guidance for analyzing whether the evidence was sufficient to uphold a defendant's conviction:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d

13

559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

Second degree murder is defined as "the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1). The only element of second degree murder at issue in this case is specific intent. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10.

"Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Draughn*, 05-1825, pp. 7–8 (La. 1/17/07), 950 So.2d 583, 592–93 (citations omitted), *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007). Additionally, Louisiana courts have repeatedly held that specific intent to kill can be inferred when a defendant points a gun at someone and pulls the trigger. *See State v. Anthony*, 23-117 (La.App. 1 Cir. 11/3/23), 378 So.3d 766; *State v. Thomas*, 55,183 (La.App. 2 Cir. 8/9/23), 369 So.3d 953; *State v. Clark*, 20-167 (La.App. 5 Cir. 11/18/20), 306 So.3d 619, *writ denied*, 20-1459 (La. 2/17/21), 310 So.3d 1150.

The fact of an intoxicated or drugged condition of the offender at the time of the commission of the crime is immaterial, except as follows:

(1) Where the production of the intoxicated or drugged condition has been involuntary, and the circumstances indicate this condition is the direct cause of the commission of the crime, the offender is exempt from criminal responsibility.

14

(2) Where the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime.

La.R.S. 14:15. In *State v. Mickelson*, 12-2539 (La. 9/3/14), 149 So.3d 178, the Louisiana Supreme Court held that the defendant has the burden of proving his defense of intoxication, after which the State must negate the defense by proof beyond a reasonable doubt that that specific intent was present despite the defendant's condition. "Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances and the defendant's actions. Specific intent may be formed in an instant." *Id.* at 182. "[W]here the jury has heard all the evidence and received the proper instructions from the trial judge regarding an intoxication defense, its verdict should not be impinged upon absent an abuse of the jury's discretion." *State v. Smith*, 95-1171, p. 4 (La.App. 3 Cir. 4/24/96), 677 So.2d 458, 461.

Ample evidence suggested that Defendant had consumed a prodigious quantity of alcohol over about a six-and-one-half-hour period. Marshelle told the 9-1-1 dispatcher that Defendant was drunk. Defendant met his burden of demonstrating intoxication at the time of the shooting; thus, the State was required to prove beyond a reasonable doubt that in spite of his condition, Defendant formed the requisite specific intent. Viewing the evidence in the light most favorable to the prosecution, per *Kennerson*, 695 So.2d 1367, we find no abuse of the jury's discretion in determining that the State proved specific intent despite his condition.

The jury heard the testimony of Dr. Hayes, who opined that Defendant exhibited little evidence of intoxication. When he was arrested, Defendant was able to stably walk backwards from his position according to the officers' instructions.

Dr. Weiss, who testified on Defendant's behalf, premised his testimony in large part on the claim that Defendant did not realize it was his wife he was shooting because she was sitting up against the headboard with the covers pulled up to her chin. The physical evidence, though, shows that Mrs. Campbell was not positioned in such a way as to lend credence to Defendant's tale. Several rounds passed through her body, and none were found to have hit the headboard of the bed, while several projectiles were retrieved from the mattress consistent with the body's position when Sergeant Magee and Corporal Toten found it.

The jury also heard from Marshelle and Markenzy, who testified that their mother and Defendant were arguing before the shooting. It was faced with completely divergent accounts of the shooting and chose the one it felt was consistent with the physical evidence. The jury accepted the testimony of witnesses it felt were more truthful. Under these circumstances, we cannot find that the jury abused its discretion in reaching its verdict.

## DECREE

Defendant's conviction of second degree murder is affirmed.

**CONVICTION AFFIRMED.**

16