STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT

DOCKET NUMBER
2024 KA 0344

STATE OF LOUISIANA

VERSUS

TYRAIL LEVARE TATE

Judgment Rendered: __NOV 1 3 2024__

* * * * *

ON APPEAL FROM THE
TWENTY-FIRST JUDICIAL DISTRICT COURT, DIVISION B
IN AND FOR THE PARISH OF TANGIPAHOA
STATE OF LOUISIANA
DOCKET NUMBER 2200674

HONORABLE CHARLOTTE HUGHES FOSTER, JUDGE PRESIDING

* * * * *

Lieu T. Vo Clark
Louisiana Appellate Project
Mandeville, Louisiana

Attorney for Defendant-Appellant
Tyrail Levare Tate


Scott M. Perrilloux
District Attorney
Brett Sommer
Assistant District Attorney
Amite, Louisiana

Attorneys for Appellee
State of Louisiana


**BEFORE: WOLFE, MILLER, AND GREENE, JJ.**

**GREENE, J.**

On April 11, 2022, the defendant, Tyrail Levare Tate, was charged by grand jury indictment with second degree murder (Count 1) and being a convicted felon in possession of a firearm (Count 2),[1] violations of La. R.S. 14:30.1 and 14:95.1, respectively. The defendant pled not guilty to the charges. Following a jury trial in October of 2023, he was found guilty as charged on both counts. The defendant filed a motion for new trial and motion for post-verdict judgment of acquittal, both of which the trial court denied. For the second degree murder conviction, the defendant was sentenced to life imprisonment to be served without benefit of parole or probation. For the felon in possession of a firearm conviction, the defendant was sentenced to twenty years at hard labor, and the trial court ordered the sentences to be served concurrently with one another.[2] The defendant now appeals, challenging the sufficiency of the evidence. For the reasons that follow, we affirm the convictions on both counts, and we affirm the sentence on count two and affirm the sentence on count one as amended. We remand for correction of the minutes and commitment order.

## FACTS

Tim Kinchen (Mr. Kinchen) lived at a residence in Tickfaw, Louisiana, along with the defendant, Merry Gill (Ms. Gill, the defendant's girlfriend), and Tiffany Schultz (Ms. Schultz, the victim). On the morning of January 12, 2022, Mr. Kinchen left for work. When he returned home that evening, all the doors were locked and no one responded to his knocks. Mr. Kinchen walked around the home, peered through an opening in the window, and observed Ms. Schultz slumped over a recliner with a pool of blood around her head. Mr. Kinchen returned to his cousin, who was waiting in his truck, and instructed him to call 911.

---

[1] According to the indictment, the defendant was previously convicted on June 11, 2019 of simple burglary in Tangipahoa Parish (case number 1802772).

[2] There is a discrepancy between the minutes and the sentencing transcript with respect to the imposition of a hard labor sentence on count one and as to the restriction of benefits on both counts. It is well settled that in the event of a discrepancy between the minutes and the transcript, the transcript prevails. See **State v. Lynch**, 441 So.2d 732, 734 (La. 1983); **State v. Bennett**, 2020-0028 (La. App. 1st Cir. 7/24/20), 309 So.3d 739, 739 n.1. The trial court's failure to order count one served at hard labor, to restrict suspension of sentence for the second degree murder sentence, and its failure to restrict benefits and impose a fine for the felon in possession of a firearm sentence are addressed in our patent error review below.

2

Officer Lee Mack Sullivan with the Tickfaw Police Department ("TPD") responded to the scene. Officer Sullivan gained entry to the home by kicking in the front door. He checked Ms. Schultz, who was deceased. No one else was inside the home, and Officer Sullivan observed no signs of forced entry. The defendant was developed as a suspect in the case, and he was later arrested.

## SUFFICIENCY OF THE EVIDENCE

In his first assignment of error, the defendant argues the evidence is insufficient to convict him of second degree murder, asserting the circumstances instead support a finding of manslaughter. In his second assignment of error, the defendant argues because the evidence is insufficient to convict him of second degree murder, the trial court should have granted his motion for new trial and his motion for post-verdict judgment of acquittal. As the assignments of error are interrelated, they will be addressed together.[3] The defendant is not challenging the conviction on count two.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV, La. Const. art. I, § 2. The question of the sufficiency of the evidence is properly raised by a motion for post-verdict judgment of acquittal. See La. Code Crim. P. art. 821. The constitutional standard for testing the sufficiency of the evidence, as enunciated in **Jackson v. Virginia**, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and adopted by the Louisiana Legislature in enacting La. Code Crim. P. art. 821, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. The **Jackson** standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the trier of fact must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. **State v. Delco**, 2006-0504 (La. App. 1st Cir. 9/15/06), 943 So.2d 1143, 1146, writ denied, 2006-2636 (La. 8/15/07), 961

---

[3] Appellate courts may review the grant or denial of a motion for new trial only for errors of law. See La. Code Crim. P. art. 858. Accordingly, the denial of the defendant's motion for new trial, in part based on La. Code Crim. P. art. 851 (B)(1), is not subject to review on appeal. **State v. Anthony**, 2023-0117 (La. App. 1st Cir. 11/3/23), 378 So.3d 766, 770 n.3, writ denied, 2024-00027 (La. 5/21/24), 385 So.3d 242.

So.2d 1160. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. See **State v. Marston**, 2000-0589 (La. 3/16/01), 780 So.2d 1058, 1062 (*per curiam*).

The defendant was found guilty of second degree murder, which is defined as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. See La. R.S. 14:30.1(A)(1). Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from circumstances surrounding the offense and the defendant's actions. **State v. Mickelson**, 2012-2539 (La. 9/3/14), 149 So.3d 178, 182. Specific intent may be formed in an instant. **Id.** at 183. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. **State v. Currie**, 2020-0467 (La. App. 1st Cir. 2/22/21), 321 So.3d 978, 983. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. **State v. Eason**, 2019-0614 (La. App. 1st Cir. 12/27/19), 293 So.3d 61, 70.

Manslaughter is a homicide that would be murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. See La. R.S. 14:31(A)(1). The elements of "sudden passion" and "heat of blood" are mitigating factors in the nature of a defense, and when such factors are established by a preponderance of the evidence, a verdict for murder is inappropriate. **State v. Anthony**, 2023-0117 (La. App. 1st Cir. 11/3/23), 378 So.3d 766, 771, writ denied, 2024-00027 (La. 5/21/24), 385 So.3d 242. However, provocation will not reduce a homicide to manslaughter if the factfinder finds the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. See La. R.S. 14:31(A)(1).

4

Provocation and time for cooling off are determinations made by the factfinder using the standard of the average or ordinary person with ordinary self-control. If a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act. **State v. Leger**, 2005-0011 (La. 7/10/06), 936 So.2d 108, 171, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). Further, mere words or gestures alone will not be a sufficient provocation to reduce a homicide from murder to manslaughter. **State v. Hollins**, 2023-0785 (La. App. 1st Cir. 3/19/24), 387 So.3d 641, 646, writ denied, 2024-00487 (La. 10/1/24), 2024 WL 4355007. See also **State v. Charles**, 2000-1611 (La. App. 3rd Cir. 5/9/01), 787 So.2d 516, 519, writ denied, 2001-1554 (La. 4/19/02), 813 So.2d 420 (an argument alone will not be sufficient provocation to reduce a murder charge to manslaughter).

## TRIAL TESTIMONY

Ms. Gill testified that she began dating the defendant in 2016, but they did not become serious until around 2020. On the day in question, Ms. Gill was at Mr. Kinchen's residence to see the defendant. Prior to moving in with Mr. Kinchen, the defendant stayed with Monica Travis (Ms. Travis) and her children for a few days. Ms. Travis's and Mr. Kinchen's homes were adjacent to one another, separated only by a thin tree line. On the morning of the murder, the defendant left with Ms. Travis to go to the store, and he was gone for several hours. Ms. Gill testified that she had had enough, and decided to leave the defendant. Therefore, she packed her belongings and called her mom using the victim's cellular phone. Ms. Gill indicated that her mother picked her up around 4:00 p.m.

Ms. Gill testified that when she left Mr. Kinchen's residence, she did not have her gun, a 9 millimeter, in her possession because the defendant had taken it out of her purse. Ms. Gill stated that he always had her gun, if she was around.[4] Ms. Gill indicated the defendant called her when he returned to the residence, and he asked why she left. During the call, the defendant and the victim began to argue. Ms. Gill testified that she

---

[4] Ms. Gill was interviewed by detectives with the TPD and Hammond Police Department. Ms. Gill informed the police that she owned a Smith & Wesson 9 millimeter pistol and she turned over to the police her gun box, which contained steel case 9 millimeter bullets.

5

did not know what they were saying to one another, but she clearly heard the defendant tell the victim "don't run for the door" and then the call dropped.

Ms. Travis testified that on the evening of January 12, 2022, she was inside her home, laying down, when she was startled by what sounded like a gunshot. A few minutes later, the defendant banged on the front door of her mobile home, and one of her children opened the door. The defendant entered her home, sat down, and was "acting regular." Ms. Travis had video surveillance cameras inside and outside her home. Ms. Travis noticed the large police presence at Mr. Kinchen's residence and when she peeked out her back window, she saw the coroner's van. According to Ms. Travis, the defendant stayed at her home while the police were at Mr. Kinchen's residence. Ms. Travis testified that the defendant began pacing back and forth and "weird stuff started happening." At that point, Ms. Travis pulled her gun out, and she instructed the defendant to "get the f--- away from my house." The defendant called someone to come and pick him up.

The day after the murder, the defendant called Ms. Gill on her cellular phone several times and she recorded all three of their conversations. During the second call, Ms. Gill asked the defendant about what lead up to the victim's death. The defendant stated that the victim lied to Ms. Gill about him making a pass at her. He further indicated that the victim lied about him messing around with Ms. Travis. The defendant indicated that is the reason why he shot her. The defendant stated "If that shit were to happen again ... I'd do it again because I wasn't lying." Ms. Gill asked the defendant: "Did you like torture her? Did she suffer?" The defendant expressed his love for Ms. Gill, then stated: "But to answer your question, No, I didn't. I just went ahead and one shot. Dome check." Ms. Gill testified that she thought the defendant's response to her question meant that he shot the victim in the head.

During the second phone call, the defendant stated: "For once, I'm doing something good. For once, I'm trying." Ms. Gill proclaimed: "No! What you did was not good. What's wrong with you?" Defendant asked: "Ok. What I'm doing [that's] not good?" Ms. Gill responded: "Um... you just murdered somebody. Like, that's not f---ing

6

good. What's wrong with you?" Defendant hesitated and then responded: "True, but listen." Defendant subsequently stated: "I wouldn't do you that."

Later in their conversation, Ms. Gill stated: "You can't go around killing people because you don't like what they say." The defendant explained the effect the killing had on him, he indicated: "I know it f--- me up, but it turned me out." The defendant then stated: "I'm [going] to tell you some real shit. I don't feel bad. I don't feel bad bro." He stated: "I sleep well at night."

Dr. Dana Troxclair with the Jefferson Parish Coroner's Office performed the autopsy on the victim. At trial, Dr. Troxclair was accepted as an expert in pathology and performing autopsies. Dr. Troxclair testified that the victim had a gunshot in the right lower eyelid. The bullet perforated the right internal carotid artery, which is the main artery going to the brain. Dr. Troxclair indicated the victim died of exsanguination; which is bleeding out, and that a person with this type of injury would only live for a couple of minutes.

Captain Louis "Jake" Gleber with the TPD was an investigator on the case. Captain Gleber testified that officers searched the home and recovered a shell casing in the kitchen and a projectile from a 9 millimeter in the upper headrest of the recliner where the victim was located. Initially, the murder weapon was not recovered. Ms. Travis testified that she reviewed the video footage from her home surveillance from the day of the murder. The defendant was captured on video removing a piece of plywood that was used to cover a hole in her living room floor. She observed the defendant drop something into the hole, which was later determined to be a live 9 millimeter cartridge. Ms. Travis turned the video surveillance over to the police. In December 2022, Ms. Travis discovered a gun hidden in the space where her air conditioning unit used to be located inside her mobile home. Ms. Travis immediately alerted the TPD, who recovered the gun, a 9 millimeter pistol.

All of the evidence recovered from the crime scene and Ms. Travis's residence was sent to the Louisiana State Police ("LSP") Crime Lab for testing. Cheryl Swearingen works in the firearms unit of the LSP Crime Lab. The parties stipulated that Ms. Swearingen is an expert in the field of analysis and ballistics examination. Ms. Swearingen performed

an analysis of the evidence in this case, which included a 9 millimeter cartridge shell casing, the projectile recovered from the crime scene, the live 9 millimeter round and the 9 millimeter Smith & Wesson. Ms. Swearingen concluded that the cartridge shell casing and the bullet were fired from a 9 millimeter Smith & Wesson model M & P firearm. Ms. Swearingen completed a test fire using the handgun recovered from Ms. Travis's residence. She determined that the recovered bullet and the test bullet were fired from the same firearm. Ms. Swearingen testified that the live rounds that were located inside the Smith & Wesson were consistent with the ammunition that was submitted by Ms. Gill.

## DISCUSSION

On appeal, the defendant argues that he discovered that his girlfriend had left him, in part, due to something the victim said about him, which made him angry and upset. The defendant asserts these circumstances support a finding of manslaughter that was committed in the heat of passion caused by provocation sufficient to deprive the average person of his self-control and cool reflection. Generally, provocative acts held to rise to the level of mitigating conduct have involved physical threats or actions on the part of the victim. See **State v. Mellion**, 2021-1116 (La. App. 1st Cir. 4/8/22), 342 So.3d 41, 46, writ denied, 2022-00732 (La. 6/22/22), 339 So.3d 1186, and cert. denied, ___ U.S. ___, 143 S.Ct. 319, 214 L.Ed.2d 141 (2022) (citation omitted).

The defendant's specific intent to kill may be inferred from his instructions to the victim not to run for the door and his act of shooting the victim in the face. Further, specific intent may be inferred from the defendant's statements during his phone conversation with Ms. Gill, which included the admission that "I just went ahead and one shot. Dome check." The defendant did not testify at trial. The only evidence of provocation, if any, came from Ms. Gill's testimony. Ms. Gill indicated that she overheard the defendant and the victim arguing, but she did not know what they were saying to one another. However, she clearly heard the defendant tell the victim "don't run for the door" and then the call dropped. Thus, there is no evidence that the victim threatened the defendant in any manner. The defendant failed to prove by a preponderance of the evidence that he was provoked to the extent necessary to deprive an average person of

8

his self-control. Further, the defendant expressed no remorse for his actions but, instead, stated "I don't feel bad" and "I sleep well at night."

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. We are constitutionally precluded from acting as a "'thirteenth juror" in assessing what weight to give evidence in criminal cases. **Eason**, 293 So.3d at 70-71.

Accordingly, we find that the jury could have rationally concluded the verbal argument between the defendant and the victim did not equate to provocation sufficient to deprive an average person of their self-control and cool reflection. The verdict reflects the jury rejected the defense of provocation. After a careful review of the entire record, viewing all of the evidence in the light most favorable to the State, we conclude that any rational trier of fact could find that the State proved beyond a reasonable doubt that the defendant was guilty of the second degree murder of the victim and that no mitigating factors were established by a preponderance of the evidence. Thus, the trial court did not err by denying the defendant's motion for post-verdict judgment of acquittal. These assignments of error lack merit.

## PATENT ERROR

This court routinely conducts a review for error discoverable by mere inspection of the pleadings and proceedings and without inspection of the evidence. See La. Code Crim. P. art. 920. On review, we find that the trial court erred by sentencing the defendant immediately after denying his motion for new trial and post-verdict judgment of acquittal.[5] "If a motion for a new ... trial is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly

---

[5] Although the motion is titled for new trial and post-verdict judgment of acquittal, the latter does not require the twenty-four hour delay. La. Code Crim. P. art. 873. See **State v. Stalls**, 2023-0829 (La. App. 1 Cir. 9/26/24), ___ So.3d ___, 2024 WL 4298033, *6 (en banc).

9

waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately." La. Code Crim. P. art. 873.

Here, defense counsel remained silent after the trial court denied the motion for new trial, and counsel did not indicate the defendant was waiving the twenty-four hour sentencing delay contained in Article 873. In **State v. Kisack**, 2016-0797 (La. 10/18/17), 236 So.3d 1201, 1205, cert. denied, 583 U.S. 1160, 138 S.Ct. 1175, 200 L.Ed.2d 322 (2018), the Supreme Court found that defense counsel's participation in the sentencing hearing was insufficient to constitute a waiver of the delay required by La. Code Crim. P. art. 873. It was further noted that an implicit waiver runs afoul of the plain language of Article 873, which requires that the waiver be expressly made. The Supreme Court made it clear that an error in failing to observe the statutory sentencing delay may still be found harmless. See **Kisack**, 236 So.3d at 1205-06. Further, in **State v. Augustine**, 555 So.2d 1331, 1333-34 (La. 1990), the Supreme Court noted the failure to observe the twenty-four hour delay provided in Article 873 may be considered harmless error where the defendant could not show that he suffered prejudice from the violation and sentencing is not raised on appeal.

After **Kisack**, courts have continued to find harmless error where a mandatory life sentence is imposed or when the defendant does not challenge his sentence on appeal and does not claim prejudice due to the lack of the delay. See e.g., **State v. Stafford**, 2020-0299 (La. App. 1st Cir. 2/22/21), 321 So.3d 965 (this court found any error in the trial court's failure to observe the twenty-four hour delay is harmless); cf. **State v. Armentor**, 2019-1267 (La. App. 1st Cir. 7/31/20), 309 So.3d 762, 772, writ denied, 2020-01032 (La. 2/17/21), 310 So.3d 1149 (this court found that because the sentence imposed was not a mandatory one and the defendant challenged his maximum sentence on appeal, the trial court's error in failing to wait twenty-four hours cannot be considered harmless.)

Here, the defendant did not file a motion to reconsider sentence, he did not challenge the mandatory life sentence or the sentence imposed on count two on appeal, and he did not assign error to the trial court's failure to observe the twenty-four hour

delay set forth in Article 873. Accordingly, any error in the trial court's failure to comply with Article 873 is harmless.

For a conviction of second degree murder, the offender shall be imprisoned at hard labor for life without benefit of parole, probation, or suspension of sentence. See La. R.S. 14:30.1(B). According to the sentencing transcript, the trial court failed to provide that the life sentence was to be served at hard labor.[6] Under La. Code Crim. P. art. 920(2), this court is authorized to consider such error on appeal. Further, La. Code Crim. P. art. 882(A) authorizes correction by the appellate court.[7] We find that correction of this illegally lenient sentence does not involve the exercise of sentencing discretion and, as such, there is no reason why this court should not simply amend the sentence. Accordingly, since a sentence at hard labor was the only sentence that could be imposed, we correct the second degree murder sentence by providing that it shall be served at hard labor. We remand to the trial court for correction of the minutes and commitment order, and for transmission of the amended record to the Department of Corrections.

In addition, our review of the record for errors reveals that while the trial court imposed restrictions on parole and probation for the second degree murder conviction and sentence, it failed to additionally impose a restriction on the suspension of sentence. The restriction of benefits is statutorily deemed to be part of the defendant's second degree murder sentence pursuant to the self-activating provisions of La. R.S. 15:301.1. See **State v. Williams**, 2000-1725 (La. 11/28/01), 800 So.2d 790, 799. Thus, when a trial court fails to order statutorily mandated service of sentence without benefits, the sentence will automatically be served without benefits for the required time period. Therefore, this is harmless error.

We note the trial court failed to impose a fine and did not restrict probation, parole, or suspension of sentence, as statutorily required, on count two. See La. R.S. 14:95.1(B). Accordingly, the defendant's felon in possession of a firearm sentence is illegally lenient. However, since these errors are not inherently prejudicial to the defendant, and neither

---

[6] The minute entry indicates the sentence is at hard labor. See **Lynch**, 441 So.2d at 734.

[7] An illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review. La. Code Crim. P. art. 882(A).

11

the State nor the defendant has raised this issue on appeal, we decline to correct these errors. See **State v. Price**, 2005-2514 (La. App. 1st Cir. 12/28/06), 952 So.2d 112, 124-25 (*en banc*), writ denied, 2007-0130 (La. 2/22/08), 976 So.2d 1277. Further, as noted above, La. R.S. 15:301.1(A) provides any applicable "without benefits" provision is self-activating.

Generally, a defendant has two years "after the judgment of conviction and sentence has become final" to seek post-conviction relief. See La. Code Crim. P. art. 930.8(A). We find the trial court failed to properly advise the defendant of the time limitation for filing an application for post-conviction relief where, at sentencing, the court stated: "[Y]ou have two years within which to file for post-conviction relief if you deem it to be appropriate." However, the trial court's failure to properly advise the defendant has no bearing on the sentence and is not grounds to reverse the sentence or remand for resentencing. **State v. LeBoeuf**, 2006-0153 (La. App. 1st Cir. 9/15/06), 943 So.2d 1134, 1142-43, writ denied, 2006-2621 (La. 8/15/07), 961 So.2d 1158. Accordingly, this error is not reversible, and we decline to remand for resentencing.

Out of an abundance of caution and in the interest of judicial economy, we instead note for the record and advise the defendant that La. Code Crim. P. art. 930.8 generally provides that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence have become final under the provisions of La. Code Crim. P. arts. 914 or 922. **LeBoeuf**, 943 So.2d at 1143.

## CONCLUSION

**CONVICTIONS AFFIRMED; SENTENCE ON COUNT TWO AFFIRMED; SENTENCE ON COUNT ONE AFFIRMED AS AMENDED; REMANDED FOR CORRECTION OF THE MINUTES AND COMMITMENT ORDER.**