**NOT DESIGNATED FOR PUBLICATION**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2023 KA 1312

STATE OF LOUISIANA

VERSUS

JERMAINE WILLIAMS

Judgment Rendered: **NOV 2 0 2024**

* * * * *

On Appeal from the
21st Judicial District Court
In and for the Parish of Tangipahoa
State of Louisiana
Trial Court No. 1501983

Honorable William Dykes, Judge Presiding

* * * * *

Scott M. Perrilloux,
District Attorney
Le'Anne H. Malnar,
Assistant District Attorney
Amite, LA

Brett C. Sommer,
Assistant District Attorney
Livingston, LA

Attorneys for Appellee,
State of Louisiana

Bertha M. Hillman
Covington, LA

Attorney for Defendant-Appellant,
Jermaine Williams

* * * * *

BEFORE: THERIOT, CHUTZ, AND HESTER, JJ.

**HESTER, J.**

The defendant, Jermaine Williams, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1, and initially pled not guilty.[1] He later moved to change his plea, and entered a plea of not guilty and not guilty by reason of insanity. As further moved by the defendant, the trial court appointed a sanity commission, held a sanity hearing, and found the defendant competent to proceed.[2] After a subsequent jury trial, he was found guilty as charged. He filed a motion for a new trial and a motion for post-verdict judgment of acquittal, both of which the trial court denied. He was then sentenced to life imprisonment[3] without the benefit of probation, parole, or suspension of sentence. He now appeals, challenging the sufficiency of the evidence. We affirm the conviction, amend the sentence, and affirm the sentence as amended.

## STATEMENT OF FACTS

On June 17, 2015, at approximately 3:22 p.m., the defendant exited the Dollar General Store located at 403 Northwest Central Avenue, in Amite, Louisiana, pulled out a gun, and repeatedly shot Joshua Lee, his next-door neighbor with whom he had a history of disputes. The shooting took place in the parking lot, in front of a building adjacent to the Dollar General. Lee suffered multiple gunshot wounds and died at

---

[1] The instant case involves a retrial. Along with second degree murder (count 1), the indictment also charged the defendant with attempted second degree murder (count 2) and five counts of cruelty to juveniles (counts 3-7). At the first trial, the jury was deadlocked on count 1, found the defendant not guilty on count 2, and found him guilty as charged on counts 3-7. The State was granted a retrial on count 1. Prior to the retrial, the defendant changed his plea on count 1. The defendant now appeals only the verdict at the retrial on count 1 (counts 2-7 are not before this court).

[2] At the sanity hearing, the parties stipulated to the defendant's competency to proceed and sanity reports were introduced into evidence.

[3] As later discussed in the patent error review section herein, contrary to the minutes and commitment order, the sentencing transcript reveals the trial court did not order the sentence to be served at hard labor. In the event of a discrepancy between the transcript and the commitment and/or minutes, the transcript prevails. See **State v. Lynch**, 441 So.2d 732, 734 (La. 1983); see also **State v. Johnson**, 2020-0679 (La. App. 1st Cir. 4/28/21), 2021 WL 1662420, *6 n.4 (unpublished), writ denied, 2021-00802 (La. 10/5/21), 325 So.3d 381.

2

the scene. Lee's fiancée, Angela Simpson, witnessed the shooting and immediately called 911.

The defendant approached the first officer to arrive on the scene, Officer Terry Zaffuto of the Amite City Police Department ("ACPD"), admitted to the shooting, and relayed his account of the incident. The defendant further informed the officer that his gun, a nine-millimeter semi-automatic firearm, was on the seat of his vehicle. The defendant was arrested, advised of his **Miranda**[4] rights, executed a waiver of rights form, and participated in a recorded interview at the ACPD. The defendant maintained Lee was armed with brass knuckles and said he was trying to leave the parking lot before opening fire to protect himself and family, due to his perceived threats by Lee.

## SUFFICIENCY OF THE EVIDENCE

In the sole assignment of error, the defendant argues the evidence was insufficient to support the conviction of second degree murder. He argues the State failed to prove he did not act in self-defense. Alternatively, he argues Lee provoked him, such that he should have been found guilty of the responsive offense of manslaughter.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for sufficiency of the evidence to support a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the State proved the essential elements of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B); **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660; **State v. Mellion**, 2021-1116 (La. App. 1st Cir.

---

[4] See **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4/8/22), 342 So.3d 41, 45, writ denied, 2022-00732 (La. 6/22/22), 339 So.3d 1186, cert. denied, ___ U.S. ___, 143 S.Ct. 319, 214 L.Ed.2d 141 (2022).

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. **State v. Currie**, 2020-0467 (La. App. 1st Cir. 2/22/21), 321 So.3d 978, 982. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. **State v. Southall**, 2022-0746 (La. App. 1st Cir. 6/2/23), 369 So.3d 925, 930, writ denied, 2023-00875 (La. 2/6/24), 378 So.3d 750.

Second degree murder is defined, in pertinent part, as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from circumstances surrounding the offense and the defendant's actions. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. **State v. Livous**, 2018-0016 (La. App. 1st Cir. 9/24/18), 259 So.3d 1036, 1040, writ denied, 2018-1788 (La. 4/15/19), 267 So.3d 1130.

4

A homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1). However, an aggressor may not claim self-defense without showing he first withdrew from the conflict in good faith and in such a manner that his adversary knew or should have known of his intention to withdraw and discontinue the conflict. See La. R.S. 14:21; **State v. Reed**, 2014-1980 (La. 9/7/16), 200 So.3d 291, 309, cert. denied, 580 U.S. 1166, 137 S.Ct. 787, 197 L.Ed.2d 258 (2017). When self-defense is raised as an issue by the defendant, the State has the burden of proving beyond a reasonable doubt the homicide was not perpetrated in self-defense. Thus, in reviewing a claim of self-defense on appeal, the issue is whether a rational factfinder, viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt the defendant did not kill the victim in self-defense. **State v. Hall**, 2013-0014 (La. App. 1st Cir. 9/13/13), 2013 WL 5177542, at *6 (unpublished), writ denied, 2013-2488 (La. 5/30/14), 140 So.3d 1168.

Manslaughter is defined, in pertinent part, as a homicide that would either be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1). The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are mitigating factors which the defendant must establish by a preponderance of the evidence. **State v. Hollins**, 2023-0785 (La. App. 1st Cir. 3/19/24), 387 So.3d 641, 646.

Provocation and time for cooling are questions for the jury to be determined under the standard of the average or ordinary person, one with ordinary self-control. If a man unreasonably permits his impulse and passion to obscure his judgment, he

5

will be fully responsible for the consequences of his act. **State v. Leger**, 2005-0011 (La. 7/10/06), 936 So.2d 108, 171, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) cert. denied (citing Reporter's Comment to La. R.S. 14:31).

At trial, the State presented several witnesses refuting the defendant's alternative claims of self-defense and provocation. The commercial parking lot where the shooting took place consisted of the Dollar General, a vacant adjacent building in which Lee was working that day helping the owner prepare for its pending opening as a "CrossFit" (hereafter referred to as "CrossFit"), and a gymnastics studio located on the right side of CrossFit. A doctor's office was located beyond the studio, in a separate parking lot, divided from the other lot by a concrete median-barrier.

Mindy Strickland, the owner of the gymnastics studio next to CrossFit, saw Lee working at CrossFit when she arrived at her gym that morning. Later that day, she heard gunshots while locking up her building. She looked out of the window, saw a white car with the doors open, and saw a black male pointing a gun at a man on the ground. She then called 911. Strickland testified she did not hear any argument or commotion prior to hearing the gunshots, stating it was quiet. She further confirmed she was close enough to the point of the shooting to have heard an argument had one taken place prior to the shooting. Strickland testified there was no way to exit the parking lot next to her studio. Rather, the parking lot exits were located along the front of the parking lot, parallel to the stores, and on a side street, located to the left of the Dollar General. Caterrico Venable, a store manager at the Dollar General, presented a store receipt confirming the defendant made purchases in the store at 3:18 p.m., just prior to the 911 calls.

Officer Zaffuto, the first responding officer, testified the defendant calmly approached him, stating in part, "I had to do it." Officer Zaffuto handcuffed the defendant, and conducted a pat-down of the defendant during which he recovered a

magazine loaded with seven bullets from the defendant's left front pocket. Officer Zaffuto then placed the defendant in the back of his unit.[5] Officer Zaffuto observed Lee lying on the ground, surrounded by staff members of the nearby doctor's office, with multiple gunshot exit wounds on his chest. In addition to the defendant and Lee, Officer Zaffuto also noted the presence of the defendant's wife and children at the scene.

Officer Zaffuto testified the defendant's vehicle, a white Kia located approximately twenty-five feet from Lee's body, was turned sideways to the right rear of Simpson's vehicle, a blue Impala. According to Officer Zaffuto, Simpson's vehicle was blocked from exiting the parking lot, as another vehicle was parked on the left side of it. Officer Zaffuto testified the defendant's vehicle was positioned in a manner similar to a police procedure used to approach subjects in a vehicle. Based on the positioning of the defendant's vehicle, Officer Zaffuto concluded the defendant was not leaving the parking lot when he stopped and that the defendant's vehicle was instead parked in a manner to prevent Simpson and Lee from exiting the parking lot. Officer Zaffuto specifically stated there was no other reason for the defendant's vehicle to be turned sideways to the right after leaving the Dollar General, as he could not exit the parking lot in that direction due to the concrete median.

Detective Allen Ordeneaux of the ACPD collected evidence at the scene. Detective Ordeneaux identified the gunshot wounds on Lee's chest as exit wounds. Detective Ordeneaux located a cigarette butt and shell casings near Lee's body, as well as a metal object fashioned in the shape of the number twenty-three on the ground next to Lee's hand. The defendant's nine-millimeter pistol was located in his vehicle on the front driver seat. Detective Ordeneaux testified the magazine

---

[5] The defendant's **Miranda** rights were read to him at the scene and again prior to the recorded interview at the police station.

removed from the defendant's pistol held seven bullets, and there was no live ammunition in the pistol when it was found. He observed holes where bullets entered Simpson's vehicle at the rear passenger door and blood spatter on the interior of the rear passenger door. Detective Ordeneaux also described the barrier in the parking lot to the right of CrossFit and confirmed there were only two ways to exit the parking lot, the side street on the left and Highway 51 in front of the lot.

Detective Ordeneaux conducted the recorded (and transcribed) interview of the defendant.[6] During the interview, the defendant stated he went to the Dollar General that day to get snacks and drinks for his wife and kids. He entered the store with his son, as his wife and the other kids waited in the car. The defendant stated when he came out of the store, he saw Simpson's vehicle, and he saw Lee standing inside the CrossFit building, looking at him. The defendant said he proceeded to enter his vehicle. He claimed as he started backing up his vehicle, intending to leave, Lee exited CrossFit, opened Simpson's back door, and stood in the doorway, still looking at the defendant in a manner the defendant described in his statement as, "mugging me." The defendant then "pulled up" and asked Lee, "what's your problem bro[?]" According to the defendant, Lee responded by telling him, "let's go on and fight." The defendant further stated he got out of his vehicle after seeing Lee reaching down, adding he saw "brass knuckles" in Lee's hand. The defendant said he thought Lee was going to grab a gun and he was thinking about his kids and family so he grabbed his gun, opened fire, and "blacked out." The defendant stated he had no other choice. The defendant did not count how many bullets he fired, but estimated it was five bullets.

The defendant also discussed disputes with Lee that he said occurred prior to the shooting. He said about two days before the shooting, while he was in his yard

---

[6] We note that twenty-two minutes of the interview were recorded, at which point the recording abruptly ends. Detective Ordeneaux testified the interview continued for an additional fifteen minutes.

on First Street in Roseland, where he and Lee lived, Lee pulled up in his vehicle and "jumped out the car . . . talking crazy" with the same "brass knuckles" in his possession. The defendant said he warned Lee not to "run up on [him]" and told him he would "hurt" him if he did so. The defendant noted he and Lee had a history of confrontations and stated he suspected Lee as the culprit of break-ins of his home music studio and his vehicle. He stated he spoke to Lee's father about the incidents, including Lee's supposed threats to burn his house down with him and his kids inside. The defendant further claimed he reported the incidents to the Roseland police.

Regarding the defendant's claim that Lee was initially inside of CrossFit "mugging" him, Detective Ordeneaux testified the CrossFit building had reflective, mirrored glass, allowing a view inside of the store only while standing directly in front of it. He stated it would not have been possible for the defendant to see someone inside of CrossFit while exiting the Dollar General and walking to his vehicle, which was, at that point, parked in front of the Dollar General. Detective Ordeneaux further confirmed no gun was found on or near Lee or Simpson or in their vehicle, and none of the witnesses he spoke with indicated that Lee had a gun.[7] Based on Detective Ordeneaux's assessment of the blood spatter on the interior of the back-passenger door and Lee's lack of entrance wounds on the front of his body, he concluded that Lee was leaning into the backseat of Simpson's vehicle when he was shot multiple times in the back of his body.

Detective Ordeneaux testified the metal object found at the scene, inches away from Lee's hand, was not brass knuckles and it could not likely be used as a weapon. In investigating the defendant's other claims, Detective Ordeneaux

---

[7] Jeff Goudeau, the firearms supervisor for the Louisiana State Police Crime Lab in Baton Rouge, testified at trial as an expert in firearms test firing and examination. Goudeau tested the defendant's firearm, along with cartridge cases, bullet fragments, and damaged bullets located at the scene and autopsy. He confirmed all of the bullets and fragments with adequate markings for testing were fired from the defendant's firearm.

confirmed there were no records at Roseland Police Department to corroborate the defendant's claims of stalking or assaultive behavior by Lee. However, the chief of police of Roseland received a complaint from Lee indicating the defendant, prior to the instant shooting, discharged a gun at him.[8]

About a week after the instant shooting, Detective Ordeneaux received evidence from a co-worker of Simpson's mother, consisting of a Facebook page printout from a posted rap music video made by the defendant. In the video, posted on social media weeks before the instant shooting, the defendant is depicted in front of his window pointing a nine-millimeter semi-automatic pistol towards Lee's yard. The video also displays a green Tommy Hilfiger shirt that matched the shirt that Lee was wearing at the time of the shooting. In the video, the defendant performs a rap song called "Try Me" containing lyrics about the "n***** next door[,]" stating, "don't make me catch a body." The defendant further raps, "it's a warning...you wear the Hilfiger, hope you get the picture, that's bullets to your chest n*****."

Dr. Dana Troxclair, the forensic pathologist who performed the autopsy, testified as an expert witness at trial. Dr. Troxclair identified seven gunshot wounds suffered by Lee. Dr. Troxclair confirmed all of the wounds on his chest consisted of exit wounds, and re-entry and re-exit wounds. Dr. Troxclair further confirmed Lee had six bullet entry wounds on the left side of the back of his body, and no exit wounds to the back of his body. As four of the wounds traveled in an upward direction, Dr. Troxclair testified it was likely that Lee was bent over during the shooting and that the shooting occurred from behind Lee.

---

[8] Sergeant Russell Walker, formerly of the Roseland Police Department, confirmed he spoke to Lee at his residence on September 4, 2014, leading to an open investigation of the defendant, during which officers of the Tangipahoa Parish Sheriff's Office went to the defendant's house. Sergeant Walker stated the defendant was detained, as he tried to flee out of the back door. They seized a firearm, the nine-millimeter used in the instant shooting, from inside the house. However, the weapon was returned to the defendant.

Lee's fiancée, Simpson, testified she dropped Lee off at the CrossFit building the morning of the shooting. She came back to pick him up after 2:00 p.m., and was with him in the parking lot while he was waiting for approval from the owner to leave for the day. She sat in her driver's seat, as Lee stood by the car smoking a cigarette. As they were talking, Lee thought he saw the defendant's vehicle in the parking lot. Suddenly, in her rear-view mirror, Simpson saw a white vehicle pull up behind her vehicle, on the side where Lee was standing. She could see the defendant talking to Lee but could not hear what the defendant was saying. Simpson said the defendant blocked her vehicle, as she was unable to move her vehicle at that point without likely hitting the defendant's vehicle or the other vehicle parked next to her vehicle. She testified everything happened quickly, stating that by the time she got out of her vehicle, Lee was already on the ground. Simpson testified Lee was attempting to walk away from the defendant.

Simpson explained the metal object, welded into the shape of the number twenty-three (the number worn by Lee's favorite professional sports player), was a gift made by Lee's dad. She described the object as just a decoration and noted it had been in her car since they cleaned out Lee's truck.[9] Simpson denied Lee ever charged toward the defendant's vehicle or made any confrontational remarks to the defendant, or that they argued before he was shot.

Marilyn Williams, the defendant's wife, also testified at the trial. She stated Lee constantly badgered and bothered her family prior to the shooting, describing constant disputes. She stated they made several police reports but nothing was done in response. She specifically claimed Lee had threatened to burn their house down. She testified they boarded up the front door due to that threat, and routinely exited the house from the back door. Mrs. Williams further testified they routinely went to

---

[9] Simpson's testimony regarding the metal object was corroborated by Lee's mother, who briefly testified at the trial.

the Dollar General in Amite to shop, instead of shopping in Roseland, in an effort to avoid seeing Lee. She stated after the defendant entered the store on the day of the shooting, she saw Lee standing by a trash can.

Mrs. Williams testified that after the defendant exited the store, they were attempting to leave the parking lot, but a vehicle was in their way, so they had to "kind of cut" in Lee's direction. She further stated, at that point, Lee was just standing at the rear of his car, staring, but then "started to walk out as [they] got closer." She stated Lee then began screaming and cursing at the defendant. As the defendant cracked his window to hear what Lee was saying, Lee began telling the defendant to get out of the car. The defendant in turn tried to get out of his car, but got caught in the doorway. She further stated Lee returned to his vehicle, reached down into the vehicle, and said "I got something for you." She stated she started to exit the car as well at that point, but the shooting happened quickly.

Mrs. Williams denied the defendant was deliberately attempting to confront Lee. She explained the defendant made the rap video as a part of a contest, and stated "everybody" made similar videos with similar lyrical content. During cross-examination, Mrs. Williams read her police statement given on the date of shooting and confirmed she did not tell the police Lee screamed at the defendant or claim Lee told him, "I got something for you."

The defendant's daughter, Jerkayla Route Boling, also testified at trial. Consistent with her parents, Boling described a tumultuous history with Lee, stating they boarded up their front door out of fear, after Lee threatened to burn their house down. She testified Lee would always make threats about harming their family and they were frightened of him. Boling waited in the car with her mother while the defendant went into the Dollar General and first noticed Lee while he was at the back of Simpson's car. She testified Lee was looking at their car for some reason.

12

Boling testified after the defendant came out and got in their car, they were about to leave. As they were driving off, Lee was still standing at the rear of Simpson's vehicle, but then he started walking towards their vehicle, "ranting and raving" and cursing at the defendant. Boling stated Lee then repeatedly told the defendant to get out of his car. She stated the defendant then tried to step out of the car, but got stuck in the door, as Lee repeatedly stated, "I got something for you." According to Boling, at that point, Lee walked back towards his vehicle and reached into the already opened door. Once Lee tried to reach into the car, the defendant, who was at that point out of their car, pulled out his gun and fired it.

On appeal, the defendant argues that based on Lee's past behavior, when he saw him in the Dollar General parking lot with what he believed to be brass knuckles, it was not unreasonable for him to believe Lee was going to beat him to death and harm his family. Thus, he argues, he reasonably believed his life was in imminent danger and deadly force was necessary to prevent the danger.[10] However, in finding the defendant guilty of second degree murder, the jury rejected the defendant's claim of self-defense and concluded the use of deadly force against Lee under the particular facts of this case was neither reasonable nor necessary.

The evidence at trial of the layout of the parking lot and the positioning of the vehicles showed the defendant was not attempting to exit the parking lot before the shooting. To the contrary, the defendant blocked Simpson and Lee from leaving, got out of his vehicle armed with a loaded gun, approached Lee, and fired until the gun was empty. Evidence at trial, including blood spatter on the interior and bullet

---

[10] The defendant has not on appeal reasserted his challenge regarding his state of mind at the time of the offense. Out of an abundance of caution, we note that expert testimony presented at trial indicated the defendant exhibited goal-directed behavior and rational control at the time of the incident and gave no indication of being under an active psychotic episode. Based on our thorough review of the record, we are convinced a rational trier of fact could have found the defendant failed to rebut his presumed sanity at the time of the offense. See La. R.S. 14:14; La. R.S. 15:432; **State v. Dixon**, 2008-1038 (La. App. 1st Cir. 12/23/08), 2008 WL 6809594, *4 (unpublished), writ denied, 2009-0189 (La. 10/30/09), 21 So.3d 275.

entry holes at the rear passenger door of Simpson's vehicle and Lee's exit wounds on his chest, further showed Lee was in Simpson's back passenger doorway when the defendant shot him from behind. Simpson disputed Mrs. Williams' and Boling's testimony regarding confrontational behavior by Lee, stating Lee was attempting to get away from the defendant when he was shot. Further, the defendant's characterization of the metal object located near Lee's body as brass knuckles was refuted at trial. Trial testimony negated any claim that the object was used in a threatening manner.

To resolve conflicting testimony relative to factual matters, the jury must make credibility determinations and weigh the evidence. The jury can accept or reject the testimony of any witness. **State v. Eby**, 2017-1456 (La. App. 1st Cir. 4/6/16), 248 So.3d 420, 426, writ denied, 2018-0762 (La. 2/11/19), 263 So.3d 1153. Based on the evidence presented at trial, the jury could have rationally concluded the defendant was the aggressor in this case, and thus unable to claim self-defense and/or the use of deadly force was not reasonable under the circumstances. See La. R.S. 14:21; **Reed**, 200 So.3d at 309. Thus, a rational factfinder, viewing the evidence in the light most favorable to the prosecution, could have found proof beyond a reasonable doubt the defendant did not kill the victim in self-defense.

The defendant further argues, in the alternative, that he was provoked into shooting Lee. However, the jury heard and rejected testimony indicating Lee provoked the defendant to exit his car. Strickland, a disinterested witness who did not know the defendant or Lee, testified she did not hear or see any provocation before the shooting. Provocation testimony is an issue of credibility. Furthermore, mere words or gestures will not reduce a homicide from murder to manslaughter. **Mellion**, 342 So.3d at 47; see also **State v. Charles**, 2000-1611 (La. App. 3d Cir. 5/9/01), 787 So.2d 516, 519, writ denied, 2001-1554 (La. 4/19/02), 813 So.2d 420 (an argument alone will not be sufficient provocation to reduce a murder charge to

manslaughter); **State v. Landry**, 2019-0486 (La. App. 1st Cir. 2/21/20), 297 So.3d 8, 13-14, 18. Finally, provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. **Mellion**, 342 So.3d at 45.

We find the jury could have reasonably concluded that there was a lack of provocation sufficient to deprive an average person of his self-control and cool reflection. Herein, the record is lacking in evidence of physical threats or actions by Lee at the time of the shooting that rose to the level of mitigating conduct. See **Mellion**, 342 So.3d at 47 (citation omitted). Further, testimony at trial showed there was a lack of police reports to substantiate the defendant's claims of a history of tumultuous behavior by Lee. Based on the circumstances of the shooting and the rap video recorded by the defendant prior to the shooting foretelling the defendant's actions, the jury could have rationally concluded the killing was not provoked or committed in sudden passion or heat of blood. Thus, based on the evidence presented in this case, we cannot say the jury was irrational in determining the defendant failed to prove any mitigating factors by a preponderance of the evidence. See **Ordodi**, 946 So.2d at 662.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the factfinder and thereby overturning a verdict on the basis of an exculpatory hypothesis presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (*per curiam*). Viewing the evidence in the light most favorable to the prosecution, we find based on the record before us, a rational trier of fact could have found that the State proved beyond a reasonable doubt all of the elements of second degree murder. Accordingly, the sole assignment of error lacks merit.

**PATENT ERROR REVIEW**

On appeal, this court routinely reviews the record for patent errors. Pursuant to La. Code Crim. P. art. 920(2), in conducting a patent error review, this court shall consider "[a]n error that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." Inasmuch as an illegal sentence is an error discoverable by a mere inspection of the proceedings without inspection of the evidence, La. Code Crim. P. art. 920(2) authorizes consideration of such an error on appeal. Moreover, La. Code Crim. P. art. 882(A) authorizes the appellate court to correct an illegal sentence on review.

As previously noted, the transcript reveals the sentence was not imposed at hard labor. Pursuant to La. R.S. 14:30.1(B), the sentence must be served at hard labor. Thus, correction of the illegally lenient sentence does not involve sentencing discretion and, as such, this court has the authority to simply amend the sentence. **State v. Hamilton**, 2019-1206 (La. App. 1st Cir. 2/21/20), 297 So.3d 782, 789, writ denied, 2020-00608 (La. 11/10/20), 303 So.3d 1046. Accordingly, we hereby correct the sentence by providing that it be served at hard labor.

Further, the record reflects the trial court failed to advise the defendant of the prescriptive period for applying for post-conviction relief under La. Code Crim. P. art. 930.8(C). Nonetheless, the trial court's failure to advise the defendant of the limitation period has no bearing on the sentence. **State v. LeBoeuf**, 2006-0153 (La. App. 1st Cir. 9/15/06), 943 So.2d 1134, 1142-43, writ denied, 2006-2621 (La. 8/15/07), 961 So.2d 1158. Out of an abundance of caution, we advise the defendant La. Code Crim. P. art. 930.8 generally provides that no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence have become final under the provisions of La. Code Crim. P. arts. 914 or 922. **LeBoeuf**, 943 So.2d at 1143.

**CONVICTION AFFIRMED; SENTENCE AMENDED, AND AFFIRMED AS AMENDED.**